## In re DENVER & R. G. W. R. CO.
### No. 8669.

District Court, D. Colorado, at Denver.

Nov. 2, 1942.

Henry W. Anderson and Hunton, Williams, Anderson, Gay & Moore, all of Richmond, Va., and Morrison Shafroth, W. W. Grant and Grant, Shafroth & Toll, all of Denver, Colo., for Insurance Group Committee.

Larkin, Rathbone & Perry, of New York City, and Norma L. Comstock and Ellis, Melville & Winner, all of Denver, Colo., for Central Hanover Bank & Trust Co., trustee.

William A. W. Stewart and Stewart & Shearer, all of New York City, and L. H. Larwill and Lindsey & Larwill, all of Denver, Colo., for United States Trust Co. of New York, trustee.

Davis, Polk, Wardwell, Sunderland & Kiendl, of New York City, and Robert G. Bosworth and Pershing, Bosworth, Dick & Dawson, all of Denver, Colo., for Guaranty Trust Co. of New York, trustee.

Milbank, Tweed & Hope, of New York City, and Lewis & Grant, of Denver, Colo., for Chase Nat. Bank of City of New York, trustee.

T. R. Woodrow and Henry McAllister, both of Denver, Colo., for Wilson McCarthy and Henry Swan, trustees.

Erskine R. Myer, of Denver, Colo., for H. Allyn Hicks, trustee.

Frank P. Lynch, Jr., and James A. Marsh, both of Denver, Colo., and Emmet McCaffery, of Washington, D. C., for Reconstruction Finance Corporation.

William R. Eaton, of Denver, Colo., for City Bank Farmers Trust Co., trustee.

William V. Hodges and Henry C. Vidal, both of Denver, Colo., for Denver & R. G. W. R. Co. and Denver & Salt Lake W. Ry. Co.

SYMES, District Judge.

On October 17, 1942, the Insurance Group Committee, so-called, representing institutions holding minority interests in various bond issues of this debtor, and certain indenture trustees of the mortgages on the debtor's property, excepting the general mortgage, filed a petition praying for an order directing the trustees to pay interest on bonds and notes of the debtor in an amount of $2,481,812.52, to be divided among the respective issues and the Reconstruction Finance Corporation in accordance with the allocations of new securities set forth in the proposed plan of reorganization approved by the Interstate Commerce Commission on July 13, 1942, known as the Commission Plan, which provides that interest shall be paid on the new bonds therein provided for when issued, from January 1, 1942.

The same parties also filed on the 23rd of October, 1942, a motion to restrain the trustees from any redemption, prepayment or other satisfaction before maturity of the principal of any obligations incurred by them, including the deferred payment of the purchase price of equipment, or any other long term obligation incurred by the trustees, and to withdraw any notice of such redemption, prepayment or satisfaction, if any has been given, and further directing the trustees to set aside cash in special trust accounts equal to the total amounts to become payable by the reorganized company on all securities issued or assumed by it pursuant to the reorganization plan approved by the Commission under date of July 13, 1942, as if such plan had been consummated on January 1, 1942, and that withdrawals from such funds shall be made only for the purpose of paying accrued interest on the new securities provided for in such plan, or existing securities.

An answer and objections to said motion were filed by the trustee of The Denver and Salt Lake Western Railroad Company and by the Reconstruction Finance Corporation. The motions were heard and argued on the 23rd and 24th of October, 1942, at the conclusion of which the court denied the petitions, stating it would file a memorandum opinion.

It will be observed that the moving parties asked to have interest paid in proportions allocated according to the proposed plan of reorganization of the Interstate Commerce Commission of July 13, 1942. It is novel that these parties should recognize and rely upon this proposed plan in view of the fact that the said plan has not been finally approved by the Commission, and not certified to this court for its consideration as required by the Bankruptcy Act. Further, these moving parties have filed objections to said plan with the Commission and are pressing the same, and, if defeated there, it may be assumed that they will renew their objections when the matter comes before this court, and may later vote against it if it is approved and submitted to the securityholders in accordance with the Bankruptcy Act.

This plan of the Interstate Commerce Commission referred to is the third that has been promulgated. The first proposed by the Commission was strenuously opposed by the proponents of these motions and other interested parties before the Commission and this court, and after full hearing was rejected by the court and returned to the Interstate Commerce Commission with the court's own suggested plan. The latter was not approved by the Commission. The Interstate Commerce Commission thereafter held further hearings, and put out the plan referred to of July 13, 1942, which these moving parties are on record as objecting to. For the reasons stated there is no certainty that the said plan will ever be adopted or become effective, and we have no reason to assume for the purposes of this motion or otherwise that this plan and its allocation of new securities will ever be finally adopted or approved by the Commission, the court, and the securityholders.

This is the fourth time that this property has been in the hands of this court in bankruptcy, the second time under the present judge.

This motion indicates that these creditors have not learned the lesson indicated by the past history of the property, which demonstrates that its financial difficulties have been due primarily to the insistence, by the bondholders and their trustees, upon the payment of interest on watered securities,

even though not earned. This particular reorganization proceeding was precipitated by the fact that the debtor, in order to stave off bankruptcy, borrowed from time to time just before bankruptcy over $12,000,000 from the Reconstruction Finance Corporation for the following purposes: to pay one or more unearned installments of interest on its Consolidated and Underlying Mortgages, interest on its Refunding and Improvement Mortgage, and to purchase certain ties the debtor had under contract. It borrowed further funds from the Reconstruction Finance Corporation to pay interest on its General Mortgage, and current taxes due the State of Colorado for two succeeding years. And later the debtor secured further loans from the Reconstruction Finance Corporation to construct the Denver and Salt Lake Western—otherwise known as the Dotsero Cut-off. In addition it caused the Reconstruction Finance Corporation to make loans to The Denver and Salt Lake Western Railroad Company, which the latter, in turn, loaned to the debtor to acquire the control of The Denver and Salt Lake Railroad—otherwise known as the Moffat Road.

The only criticism that can be made of the Reconstruction Finance Corporation is that it loaned money to this debtor when it was bankrupt, thus enabling it to stave off bankruptcy and make its financial condition worse when it finally came into court. In view of this it is hard to understand the present hostility that these moving parties have shown to the Reconstruction Finance Corporation as a creditor, or explain the conflicting views each takes on the controversial points that have arisen in the course of this proceeding.

This particular motion was precipitated evidently by the plans of the trustees, Mr. McCarthy and Mr. Swan, to pay out of cash on hand $2,282,106 of trustees' obligations representing the balance due on certain Diesel engines and switchers, five steam locomotives and three Diesel freight locomotives, and to pay cash for certain equipment on order and soon to be delivered.

It is true, as argued, that during the last year and a half the earnings of this property have increased out of all proportion, and show a greater per cent of increase than any other Class 1 railroad in the Western territory. The gross for the current year it is estimated will be over $50,000,-000 as against $31,000,000 for 1941.

The financial program of the trustees to which objection is made is as follows:

| | | |
|---|---:|---:|
| Estimated cash balance January 1, 1943, before payment of conditional sales agreements | | $10,057,000 |
| Requirements: | | |
| Balance (Dec. 1, 1942) on conditional sales agreements as follows: | | |
| Electro-Motive Corporation (assigned to Omaha National Bank) covering one 1,000 h.p. Diesel switcher purchased to serve Denver Ordnance Plant | $ 62,05. | |
| Northern Trust Co., Chicago, covering 13 Diesel switchers acquired summer of 1941 to handle increased business account defense effort | 545,313 | |
| Baldwin Locomotive Works (assigned to City National Bank and Trust Co., Chicago), covering 5 steam locomotives acquired 1941 and being amortized as Defense Project under War Dept. Necessity Certificate WD-N-3303 | 710,370 | |
| Electro-Motive Corporation (assigned to First National Bank of Denver), covering three 5400 h.p. Diesel freight locomotives acquired 1941 and being amortized as Defense Project under War Dept. Necessity Certificate WD-N-3303 | 964,361 | $ 2,282,106 |

| | | |
|---|---:|---:|
| Equipment on order: | | |
| Six 5400 h.p. Diesel freight locomotives being built by Electro-Motive Division, General Motors Corporation, to handle traffic developed by Defense Plant Corporation (Columbia Steel) steel mills near Provo, Utah, covered by Rio Grande Purchase Order 7051, 2-17-42. (Delivery, originally scheduled for Sept.-Oct., 1942, postponed because locomotive plant capacity being devoted to Navy orders) | | 3,044,746 |
| 1,000 70-ton gondolas to handle Provo Steel traffic, Rio Grande Order 12283 7-3-42 (Supplemented 9-29-42) (780-'42 220-'43) | | 3,582,300 |
| 300 Dump cars to be acquired for handling of limestone and dolomite to new steel mills near Provo (Not ordered but desired at once and trying to get secondhand. Offer made to purchase 160 at 1,500.00.) | | 990,000 |
| Cash required to complete work authorized by Court but not yet performed | | 3,700,000 |
| Estimated 1942 Income Tax Payments | | 1,300,000 |
| Cash working fund required | | 1,250,000 |
| Total Cash Requirements | | $16,149,152 |

All of this equipment is necessary, in the opinion of the trustees, for the proper operation of the property under war conditions, to serve promptly and efficiently the many government war plants established on the

line of this railroad, as well as the tremendous increase in bridge traffic consisting of thousands of troops and quantities of war munitions en route to the Pacific Coast and in the opposite direction. Most of this equipment has been ordered at the special request of the government. Washington has told the trustees just how much equipment they must have, for instance, to serve the new Columbia Steel Plant being built on the line of this railroad near Provo, Utah, and also that 2,000 new cars are necessary to haul coal from Utah to the new steel plant in southern California.

The moving parties objecting say: "No avoidable payments should be made, particularly any retirement before maturity of equipment obligations for the payment of which at maturity funds will be provided through charges for equipment depreciation, in such manner as to prejudice the payment in 1942 of such accruals of interest under the Commission Plan."

■ It is the view of the court and its trustees that these greatly increased earnings—which it is said justify the payment of the interest—are the direct result of the present war emergency. Conservative management and business principles dictate that all expenditures incurred to provide the necessary facilities to handle this increased business should be paid from such revenues and not passed on as a debt to the new corporation when it takes over the property under the reorganization.

It is true, as alleged, that $30,000,000 has been paid out in rehabilitation of right-of-way, shops and equipment. To some of these expenditures the parties have from time to time objected. The tremendous business this property is now doing as a transcontinental carrier of war material and troops has amply justified these expenditures as well as the trustees' financial policy.

■ The duty of the court in this respect is stated by the Court of Appeals in Van Schaick v. McCarthy, 10 Cir., 116 F.2d 987, in which the propriety of some of these expenditures was raised, the court saying at page 993 of 116 F.2d: "During that period the railroad company must be operated by the trustees under the supervision and control of the court in the public interest and for the protection of the private interests involved, and to that end such expenditures must be made as are reasonably necessary to preserve and protect those interests

and maintain the integrity of the railroad, so that it may be turned over to the reorganized company as a going concern. Sec. 77 contemplates that the reorganized road shall be a living, not a dying, railroad enterprise. To permit the competitive position of the road to be lost during the period of reorganization would greatly endanger the future earnings upon which the plan is to be largely based and out of which the reduced fixed charges are to be paid."

■ The expenditures proposed, supra, are reasonable and necessary to preserve and protect the interests of the security-holders, and maintain the integrity of the railroad as a going concern so that it may be turned over to the new company in reorganization as a going concern. But there is the additional reason at this time, towit, the duty of this railroad as a transcontinental transportation facility under war conditions to meet the demands of the government. The demand is that the trustees borrow the money to pay for new equipment rather than to pay for it out of cash on hand and thus save over $100,000 in interest. If this equipment is purchased and paid for in full, after reorganization is completed the new owners can still use it as collateral for further loans.

It is also urged that the estimated cash balance of $10,057,000 as of January 1, 1943, can be safely distributed at this time. Sight is lost of the fact that the first six months of every year have been the lowest in the earnings of this property. It has always been necessary to carry over January 1st of each year a large cash balance to meet taxes due the last of February, to complete improvement work already authorized by the court and not yet performed, and to meet other large expenditures during the first six months of the year when earnings are small.

The motion and the argument in support thereof disclose a marked cleavage between the business policies of the trustees and these creditor institutions. The court believes in old-fashioned finance, desiring to pay its own obligations incurred during trusteeship and those resulting from the war emergency ahead of interest on defaulted obligations which the court inherited, and while these revenues exist. It would thus trim its sails and be in as safe a financial condition as possible when the inevitable slump comes as it is bound to within the next few years.

Mr. Chief Justice Hughes, in Carpenter v. Wabash R. Co., 309 U.S. 23, at pages 27, 28, 60 S.Ct. 416, at page 418, 84 L.Ed. 558, said: "We have held that earnings, while a railroad is in possession of the court and operated by its receivers, 'are not necessarily and exclusively the property of the mortgagees' but are subject to the payment of claims which have superior equities as these may be found to exist," citing authorities.

Furthermore, the granting of this motion would open the gateway to a flood of applications for the diversion of these swollen earnings, such as the payment of rent due the Reconstruction Finance Corporation for the use of the Denver and Salt Lake Western (the Cut-off), and likewise rent on the Junction railroad, and many other pending claims now quiescent. The court is also informed that payment of past due interest would raise a very serious income tax situation which cannot be determined with any degree of exactness in advance.

Counsel strongly urge the court to defer its judgment to that of these trustee institutions of New York, emphasis being laid upon their experience and judgment in large financial affairs, especially railroads. This brings to mind the fact that it is some of these same trustees who have dictated the policy of this railroad, and are responsible for the money borrowed to pay interest not earned and current expenses such as taxes already referred to. Millions of dollars have been borrowed by the trustees during the seven years they have been in charge of this property. Their obligations have been met with such promptitude, often in advance, as to establish in the money markets of the country such a credit rating that when they need temporary funds, unlike other roads in reorganization, they are able to borrow money without resort to any of the lending agencies of the federal government, to none of which are the trustees at present indebted. Before this railroad came into the hands of the court, it borrowed money on equipment obligations at the rate of five to five and a half per cent, while the trustees have borrowed several millions of dollars on trustees' certificates at the rate of three and a quarter per cent and some as low as two per cent and less.

A somewhat similar question was presented to Judge Davis of the District Court of St. Louis (who has had perhaps more experience in railroad reorganizations than any other federal judge) in the Matter of St. Louis Southwestern Railway Company, D.C., 17 F.Supp. 68. The question there was that the trustees asked authority to make certain expenditures to build and purchase new engines and passenger coaches, and the railroad trustees, as here, desired to pay for it in cash. The trustees under three general mortgages of the company asked that the railroad trustees be directed to negotiate equipment trust certificates for the financing thereof, and at the same time petitioned for the payment in cash of certain defaulted interest installments under the railroad's second mortgage income bond certificates. The debtor deemed that the trustees' cash position and its present and prospective earnings fully justified the expenditure of cash for the building of the locomotives and the purchase of the coaches. The court held, first, that it was without authority to increase indebtedness in reorganization proceedings by authorizing the issuance of additional securities, stating the Bankruptcy Act does not contemplate such an action unless it is essential for the continued operation of the railroad as a common carrier, and, further, that the custom of railroad financing whereby railroad equipment is ordinarily financed through equipment trust issues was insufficiently persuasive to authorize the trustee of a railroad in reorganization to finance necessary equipment where the trustees had sufficient cash with which to pay for the equipment. The court further held that current expenses arising out of operation of the business constitute claims prior to those of the bondholders, and must be paid by the bankruptcy trustee out of available funds, and, finally, that trustees of the railroad in reorganization would be allowed to finance essential equipment out of cash available rather than by issuing trust equipment certificates so that a portion of the cash could be used to pay defaulted bond interest, since, under the rule which makes claims for operating expenses during receivership prior to bondholders' claims, expenditures, though chargeable to capital account, are entitled to some preferred status. And, finally, that the District Court in which the railroad has filed a petition for reorganization should not, in exercising its discretion, increase the indebtedness which the railroad seeks to decrease; but, where cash is on hand to pay for necessary additions and replacements, the court should authorize expenditure of such cash for such purpose.

On appeal the Circuit Court of Appeals of the Eighth Circuit affirmed Bankers Trust Co. v. Henwood, 88 F.2d 163, 166. The court, speaking through Judge Stone, held that an order of the District Court in a corporate reorganization proceeding, authorizing the trustee to purchase rolling stock for cash, was made in the exercise of discretion which could not be reviewed. In the case at bar, as in that case, the court is really asked to incur additional indebtedness by the issue of equipment certificates in order that cash in the hands of the trustees may be used to pay interest on defaulted obligations. In the Circuit Court of Appeals the appellants' took exception to the following from Judge Davis' opinion: "The debtor came into this court to reduce its debts through a plan of reorganization. Certainly the approval of a new form of indebtedness, which almost of necessity must be binding on the successor or reorganized company, thereby increasing the funded debt, when the trustee has or will have sufficient cash on hand to pay for the essential equipment, is within neither the letter nor the spirit of the law."

Asserting a custom of long standing whereby railroad equipment is ordinarily financed through equipment trust issues the Court of Appeals observed: "There is no authority to the effect that equipment must be so financed, and the fact that such procedure is customary, if that be the case, is not sufficiently persuasive to alter the equities or logic of the situation."

In Southern Railway Co. v. Carnegie Steel Co., 176 U.S. 257, 20 S.Ct. 347, 358, 44 L.Ed. 458, the Supreme Court observed that they had refrained from laying down any rule controlling in every case, involving the rights of unsecured creditors of a corporation in the hands of a receiver to have their demands paid out of net earnings in preference to mortgage creditors, stating: "But it may be safely affirmed, upon the authority of former decisions, that a railroad mortgagee when accepting his security impliedly agrees that the current debts of a railroad company contracted in the ordinary course of its business shall be paid out of current receipts before he has any claim upon such income; that, within this rule, a debt not contracted upon the personal credit of the company, but to keep the railroad itself in condition to be used with reasonable safety for the transportation of persons and property, and with the expectation of the parties that it was to be met out of the current receipts of the company, may be treated as a current debt."

This would seem to be ample justification for the policy of the trustees who in their discretion wish to finance current needs for equipment and improvements out of the earnings as far as they will go. It would seem to be a matter of discretion which the court should not interfere with, especially when, as here, the moving parties acquiesce in the views of the trustees as to the necessity for this new equipment.

The court, from its own knowledge of this property and its physical needs, knows that as a result of the tremendous business the property is now doing, there is a constant and enormous depreciation in the rolling stock and right-of-way. This is especially true of the motive power evidenced by the fact that engines are now turned about at terminals and sent out again without proper time for shopping and maintenance repairs. Further, in order to handle the business the trustees have leased from other railroads eighteen locomotives. Before long it will be necessary to authorize another budget of expenditures for improvements to take care of this wear and tear that the roadway and its equipment is being subjected to, and which it is impossible to renew due to the number of trains passing over the line and priority requirements for materials.

In conclusion, I am of the opinion that the trustees have not abused their discretion in the use they propose to make of current earnings. The motions should be and are denied.