## GUARANTY TRUST CO. OF NEW YORK et al. v. SEABOARD AIR LINE RY. CO. et al., and eight other cases.

### Nos. 213, 214, 228, 229, 172–174, 237, 238.

District Court, E. D. Virginia.

Dec. 15, 1943.

---

W. R. C. Cocke, of Norfolk, Va., Willkie, Owen, Otis, Farr & Gallagher, Harold J. Gallagher, and Lewis F. Carroll, all of New York City, for Receivers.

F. P. Fleming, of Jacksonville, Fla., for receivers in Fifth Judicial Circuit.

Venable Baetjer & Howard and Joseph France, all of Baltimore, Md., for Underlying Bondholders' Committee.

Sullivan & Cromwell and DeLano Andrews, all of New York City, for First and Consolidated Bondholders Committee.

Davis, Polk, Wardwell, Sunderland & Kiendl and Edwin S. S. Sunderland, all of New York City, for Guaranty Trust Co. of New York and Merrel P. Callaway.

Van Vorst, Siegel & Smith, and Arthur B. Brenner, all of New York City, for Refunding Mortgage Bondholders Committee.

Humes, Buck, Smith & Stowell and Irwin L. Tappen, all of New York City, for New York Trust Co.

Baird, White & Lanning and George M. Lanning, all of Norfolk, Va., for Seaboard Refunding Mortgage Trustee.

Niles, Barton, Morrow & Yost and Carlyle Barton, all of Baltimore, Md., for Maryland Trust Co.

Eugene J. Conroy, of Newark, N. J., for Prudential Life Ins. Co.

Root, Clark, Buckner & Ballantine and Lyman M. Tondel, Jr., all of New York City, for New York Life Ins. Co.

Williams, Mullen & Hazelgrove, Lewis C. Williams, and Ralph T. Catterall, all of Richmond, Va., for Equitable Life Assur. Soc. and other holders of Atlanta-Birmingham bonds.

Davies, Auerbach, Cornell & Hardy and H. C. McCollom, all of New York City, for Irving Trust Co.

Mitchell, Capron, Marsh, Angulo & Cooney and Edward E. Watts, Jr., all of New York City, for City Bank Farmers Trust Co.

Jennings & Watts and Olin E. Watts, all of Jacksonville, Fla., for Barnett Nat. Bank.

A. Mitnovetz, of New York City, and Harry O. Levin, of Baltimore, Md., for Protective Committee, Georgia & Alabama 5s 1945.

Piper, Watkins & Avirett and James Piper, all of Baltimore, Md., for Baltimore Nat. Bank.

Smith & Cross and Eben J. D. Cross, all of Baltimore, Md., for Mercantile Trust Co.

Edmund S. Ruffin & Sons and Robert D. Ruffin, all of Norfolk, Va., for trustees under underlying mortgages of Raleigh & Gaston and others.

Meredith & Meredith and Bernard Meredith, all of Richmond, Va., for Mercantile Trust Co.

Paul R. Kach, of Baltimore, Md., for Mercantile Trust Co.

Clarence K. Bowie, of Baltimore, Md., for the Bondholders' Committee of Tampa & Gulf Coast R. R. 1st 5s of 1953.

Marshall, Carey & Doub and R. E. Lee Marshall, all of Baltimore, Md., for Bondholders Committee of Tampa Northern R. R.

Chadbourne, Hunt, Jaeckel & Brown and Alfred H. Phillips, all of New York City, for Seaboard-All Florida Bondholders Committee.

Joseph S. Nye, Chairman of Georgia, Florida & Alabama (6s, 1952) Committee.

J. Paul Schmidt, of Baltimore, Md., and Philip B. Wershil, of New York City, for Adjustment Bondholders Group.

Wm. H. B. Simpson, of Greenville, S. C., for himself and other security holders.

Chalmers E. Wessinger, for himself and other common stockholders.

CHESNUT, District Judge.

The Seaboard Air Line Railway Company has been in receivership in this court for nearly thirteen years. Ancillary receivership proceedings have similarly been pending in the District Court of the United States for the Southern District of Florida. During this period several efforts have been made by the court to effect a plan of reorganization. In 1935 the court instructed the Receivers (Messrs. Legh R. Powell and Col. Henry W. Anderson) to prepare a plan for reorganization. Extended studies and tentative proposals were made by the Receivers but the then relatively poor earnings of the railroad caused the principal secured creditors to oppose further procedure along this line at that time; and the Receivers then were excused by the court from further activities in that respect. But on October 27, 1939 the court entered an order appointing Tazewell Taylor, Esq., a highly competent member of the Bar having had special experience in railroad matters and with the affairs of the particular railroad, to prepare and submit a plan of reorganization, after careful study and hearings of all parties in interest and development of all relevant evidence and other data pertaining to the subject. The appointment was made pursuant to Rule 53 of the Rules of Civil Procedure of the District Courts of the United States, 28 U.S.C.A. following section 723c. The master was given very full power and authority to hold hearings pursuant to notices, to receive evidence and to consider plans of reorganization submitted by any parties in interest. Somewhat similar orders with respect to the special master's authority and procedure were passed in the ancillary Florida proceedings. After very full direct notice to all parties in interest who had appeared in the proceedings from time to time, and frequent published notices, special master Taylor conducted hearings, took evidence, received statistical studies over a period of more than three years, considered various plans of reorganization submitted by parties in interest and finally on July 20, 1943, submitted his report. This consists of a printed document of 283 large pages, to which are appended numerous tabulations and exhibits.

After the receipt of the report, Judge Way entered an order notifying the parties in interest to file any objections or exceptions that they wished to make to said report, and setting the date for hearing the

same on October 18, 1943. By reason of the subsequent illness of Judge Way (followed later by his most regrettable death) the case has been referred to the writer of this opinion for further judicial attention. On October 25, 1943, pursuant to further direct and published notices, all parties in interest were heard for a period of two weeks. At that time further evidence was submitted at a joint hearing held by the writer and United States District Judge Akerman of the Southern District of Florida, presiding Judge in the ancillary proceedings. At the adjournment of these hearings the court appointed a Conference Committee of certain representative secured creditors to consider and propose modifications of the plan of reorganization. This Committee, after further intensive study of the plan for a period of ten days and hearing certain interested parties objecting to the plan, submitted its report for substantial modification of the allocation of the new securities. A further hearing, after notice, has been held on these proposed modifications. The matter now stands for determination by the court with respect to the confirmation, rejection or modification of the plan submitted by the special master.

The master's printed report contains a table of contents which shows the vast scope of the studies made by him and his careful consideration of the extended evidence, oral and documentary, submitted at the hearings. It includes (1) the corporate history of the Seaboard Air Line Railway Company and its subsidiaries; (2) a general description of its property and assets; (3) its present debt and capital structure; (4) the properties to be dealt with in the reorganization; (5) data pertaining to its physical value and other capitalizable assets; (6) the earnings experienced and forecast of the earnings; (7) the proposed capitalization of the new company; (8) classifications of creditors, security holders and stockholders; (9) claims not affected by the plan; (10) consideration of conflicting liens; (11) the amount of interest on past due instalments of interest; (12) studies incident to the allocation of the securities of the new company; (13) the proposed allocation of such securities; (14) consideration of certain other factors in the method of consummating the plan; and (15) method of putting the plan into effect. And finally, the ultimate conclusions of the special master with respect to the whole plan.

Rule 53 of the F. R. C. P. deals with the procedure relating to appointments of special masters by the court. Subsection (e) (2) provides in part:

"In an action to be tried without a jury the court shall accept the master's findings of fact unless clearly erroneous. * * * The court after hearing may adopt the report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit with instructions."

In passing upon the very numerous exceptions which have been filed to the master's report, it will be impracticable in an opinion of any reasonable length to review in meticulous detail either each and all of the numerous exceptions, or to restate all the facts and figures with regard to the Railway Company which have been so fully considered and are treated at such length in the master's printed report. It must be assumed, therefore, that the reader of this opinion is familiar with the main features of the report. An effort will be made here to simplify the statement of the rulings now to be made, as far as possible. A brief description of the Seaboard Air Line Railway Company will show the great complexity of the problem of its reorganization.

## Brief Description of the Seaboard System

The present Seaboard Air Line Railway Company is the fourth corporation of the similar name. It is a consolidated corporation under the laws of Virginia, North Carolina, South Carolina, Georgia and Florida, and is also qualified to do business in Alabama. It was organized in 1915 and is the successor to three successive companies, each known as Seaboard Air Line Railway. It owns and operates more than 4,000 miles of railroad. The main stem of the Seaboard System extends from Richmond, Virginia, on the north, to Homestead on the east coast of Florida, and Naples on the west coast of Florida. From the main stem lines extend from Norlina, North Carolina, to Portsmouth, Virginia; from Hamlet to Wilmington, North Carolina, on the east and to Charlotte and Rutherfordton, North Carolina, and Atlanta and Birmingham on the west; from Savannah to Montgomery and from Jacksonville westwardly

to Tallahassee and River Junction, Florida. There are numerous branch lines in Florida.

Included in the more than 4,000 miles of railroad owned by the Seaboard are over 2,000 miles which are subject to ten separate underlying divisional mortgages. The total principal and unpaid interest on which (held by the public) as of January 1, 1943, amounted to $48,549,767.20. Subordinate to these underlying liens, but constituting first liens on certain portions of the whole railroad system are four general mortgages known as (1) first mortgage 4% bonds due April 1, 1950; (2) refunding mortgage 4% bonds due October 1, 1959; (3) first and consolidated mortgage 6% bonds, series A, due September 1, 1945, and (4) adjustment mortgage 5% bonds due October 1, 1949. These latter so-called adjustment mortgage 5% bonds are subordinate in lien to the refunding mortgage 4% bonds. The total principal and interest of these general mortgage bonds publicly held, aggregates $160,439,473.33. In addition there are $36,806,862.55 of Seaboard collateral trust obligations. The general unsecured claims against the Seaboard not entitled to priority of payment ahead of mortgage liens (as of August 1, 1942), principal and interest, amounted to $1,193,723.-97. The par value of the outstanding· capital stock of the Seaboard Air Line Railway Company, preferred and common, aggregates $85,110,662.21. During the course of the receivership the Receivers have incurred obligations represented by, outstanding receivers' equipment trust certificates in the amount of $13,531,000, and receivers' certificates in the amount of $23,128,000, and other indebtedness, aggregating in all $38,412,882.37. The grand total of principal and interest of the *secured* debt in the hands of the public is $221,362,-460.25, on which there is unpaid interest amounting to $118,889,124.39, a total of principal and interest of $340,251,484.64, which is, of course, exclusive of capital stock. During the course of the receivership, principally in the last two years, the Receivers have purchased and acquired about $34,000,000 par value of outstanding receivers' certificates, and other secured obligations of the System. Nearly all of the securities were acquired by the Receivers under orders of court to the effect that the application of the moneys therefor should be without prejudice to the claims of parties in interest with respect to the application of the moneys so used. And during the receivership the Receivers have also applied upwards of $50,-000,000 in betterments to the railroad system.

In the special master's plan for reorganization it is proposed that there shall be included into one unified railroad system (1) all the properties heretofore owned outright by Seaboard; (2) all wholly owned subsidiaries; (3) subsidiaries partly owned but with some outstanding debt or stock held by the public and (4) the leased lines. The several separate properties thus to be dealt with are subject in whole or in part to eighteen separate mortgages.

## The Seaboard Is Insolvent

The special master found on ample and convincing evidence, that the Seaboard is *insolvent* according to both the equity and the bankruptcy definitions. In consequence he decided that the holders of the stock, both preferred and common, were not entitled to participate beneficially in the reorganization. He likewise found that the holders of the Adjustment 5% Bonds above mentioned would not be entitled to participate because the securities of the reorganized company properly allocable to the Refunding Mortgage 4% Bonds (to which the Adjustment 5% Bonds were subordinate) would be insufficient to satisfy the claims of the 4% Refunding bondholders. He also found that the unsecured debt above referred to was not entitled to participate in the reorganization because the new capitalization would be insufficient to fully satisfy the claims of the holders of the secured debt. He also found that the stock of the subsidiaries publicly held would not be entitled to participate because the new securities allocable to the debt of those companies were insufficient to satisfy the claims thereon in full.

## Two Outstanding Questions

The result of these findings necessarily limited the problem of reorganization to two main questions (1) what would be a proper reduced capitalization for the reorganized company, and (2) what allocation of the new securities should be made among the numerous classes of secured creditors. There will now be outlined as simply as

possible how the special master determined these two outstanding questions.

The elaborate report of the special master shows with what great care he considered these questions in the light of the voluminous testimony and all relevant data. It also shows that he gave careful consideration to the statutory and case law applicable to railroad reorganizations, and particularly had in mind the important principles applied by the Supreme Court of the United States in the very recent cases of Ecker v. Western Pacific Corp., 318 U.

## The New Capitalization

With respect to the properly permissible capitalization of the reorganized company, the determination of the special master was principally based upon the earnings, history and prospects of the Railway. (See pp. 115 to 121 of the master's report). On page 118 will be found the following statistical compilation of (1) total Railway operating revenues; (2) net Railway operating income and (3) total gross income of the Railway for the 15-year period, 1926-1940.

| Year | Average Mileage Operated | Total Railway Operating Revenues | Net Railway Operating Income | Other Income | Total (Gross) Income |
|---|---|---|---|---|---|
| 1926 | 4,329 | $71,274,835 | $12,787,301 | $1,853,541 | $14,640,842 |
| 1927 | 4,487 | 63,268,934 | 10,673,994 | 2,268,636 | 12,942,630 |
| 1928 | 4,501 | 57,301,821 | 10,015,047 | 2,432,946 | 12,447,993 |
| 1929 | 4,493 | 58,205,713 | 10,934,232 | 1,229,580 | 12,163,812 |
| 1930 | 4,498 | 49,747,423 | 5,806,470 | 1,016,471 | 6,822,941 |
| 1931 | 4,482 | 42,366,632 | 2,580,798 | 489,132 | 3,069,930 |
| 1932 | 4,427 | 30,791,618 | 199,224 | 520,807 | 720,031 |
| 1933 | 4,359 | 31,626,026 | 2,620,546 | 490,818 | 3,111,364 |
| 1934 | 4,312 | 33,934,391 | 1,628,157 | 406,881 | 2,035,038 |
| 1935 | 4,311 | 34,008,579 | 1,497,449 | 335,963 | 1,833,412 |
| 1936 | 4,311 | 38,423,314 | 3,527,374 | 368,074 | 3,895,448 |
| 1937 | 4,312 | 42,865,051 | 3,768,725 | 393,628 | 4,162,353 |
| 1938 | 4,321 | 40,086,098 | 1,476,376 | 328,269 | 1,804,645 |
| 1939 | 4,330 | 44,252,278 | 3,615,172 | 350,686 | 3,965,858 |
| 1940 | 4,316 | 48,596,779 | 4,432,931 | 329,027 | 4,761,958 |
| 5 yrs. average 1926–1930... | | 59,959,745 | 10,043,409 | 1,760,235 | 11,803,644 |
| 9 yrs. average 1931–1939... | | 37,594,887 | 2,323,758 | 409,362 | 2,733,120 |
| 14 yrs. average 1926–1939... | | 45,582,337 | 5,080,776 | 891,817 | 5,972,593 |
| 6 yrs. average 1934–1939... | | 38,928,285 | 2,585,542 | 363,917 | 2,949,459 |
| 10 yrs. average 1931–1940... | | 38,695,077 | 2,534,675 | 401,329 | 2,936,004 |
| 15 yrs. average 1926–1040... | | 45,783,299 | 5,037,587 | 854,297 | 5,891,884 |
| 5 yrs. average 1936–1940... | | 42,844,704 | 3,364,116 | 353,937 | 3,718,053 |

S. 448, 63 S.Ct. 692 (hereinafter sometimes referred to as the Western Pacific case), and Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific R. R. Co., 318 U.S. 523, 63 S.Ct. 727 (hereinafter sometimes referred to as the Milwaukee case). These cases dealt specifically with reorganizations under the bankruptcy statute, section 77, 11 U.S.C.A. § 205, but the principles thereof to a great extent are likewise applicable if the reorganization is through equity procedure and not under section 77. The special master also gave careful consideration to the practice and conclusions of the Interstate Commerce Commission in other railroad reorganizations.

From this table it will be found that in this 15-year period the greatest annual total Railway operating revenues were in the year 1926 in the amount of $71,274,835, with total gross income of $14,640,842. The lowest annual figures were for the year 1932 (in the depth of the economic depression) when total Railway operating revenues were $30,791,618, and total gross income $720,031. In 1940 the total Railway operating revenues were $48,596,779, with total gross income of $4,761,958. For the ten years average, 1931 to 1940, the total gross income was $2,936,004. For the five years average, 1936 to 1940, the total gross income was $3,718,053. However, it is presently important to contrast with

these figures what has occurred in the last three years. In 1941 the total Railway operating revenues were $64,729,178, with total gross income of $10,664,016; in 1942 the total Railway operating revenues were $110,467,787, with total gross income of $34,566,102. For 1943 it is estimated that the total Railway operating revenues will approximate $137,000,000, with estimated *gross income* before federal taxes and increased wages of about $50,000,000. It is, however, not possible at this time to determine with even approximate certainty what will be the net income for 1943 applicable to fixed charges in view of the uncertain amount of increased federal taxes and expenses of operations owing to increased wages to employes. It is also recognized that the present greatly increased revenues are the result almost entirely of wartime activities which it is hoped, in the national interest, will not long continue; and upon resumption of normal activities it is reasonably to be anticipated that there will be a very great shrinkage in such Railway revenues, both total and net.

In the new capitalization based on the earnings records and prospects, the master first considered that the proposed capitalization of the new company should be, in addition to $13,835,000 of undisturbed receivers' equipment trust certificates, $40,000,000 par value of first mortgage bonds, $45,000,000 par value of income mortgage bonds, $15,000,000 of preferred stock and 850,000 shares (no par value) of common stock. However subsequently a large amount of receivers' certificates were retired and in view of that and other considerations the master finally recommended the following new capitalization:

### Capitalization of the new company as finally recommended
#### (As of January 1, 1944)

| Title of Issue | To be assumed or issued on reorganization | Annual charges, interest and dividends |
| --- | --- | --- |
| Rentals and misc. charges, undisturbed.... | | $ 110,000 |
| Undistributed Receivers' Equipment Trusts | $ 11,870,000 | 336,000 |
| First Mortgage Forty-Year 4% Bonds, Series A (distribution)............... | 32,500,000 | 1,300,000 |
| Total fixed interest debt............. | 44,370,000 | |
| Total Annual fixed charges.......... | | 1,746,000 |
| Capital Fund (Discretionary, not in excess of 3¼% of Total Railway Operating Revenues or $1,625,000, whichever is greater) ............................ | | $1,625,000 |
| Sinking Fund for First Mortgage Bonds Series A (1%).................... | | 325,000 |
| Total Annual Charges prior to interest on Income Mtge. Bonds............ | | 3,696,000 |
| Income Mortgage 50-year 4½% Bonds, Series A .............................. | $ 52,500,000 | 2,362,500 |
| Sinking Fund for Income Mtge. Bonds, Series A ($262,500) ................ | | |
| Total fixed and contingent debt....... | 96,870,000 | |
| Total annual charges before dividends | | 6,058,500 |
| Preferred stock 5% ($100 par value)...... | 15,000,000 | 750,000 |
| Total par value of securities........... | $111,870,000 | |
| Total annual charges against income through preferred stock dividends.. | | 6,808,500 |
| Common Stock (shares of no par value).. | 850,000 | |
| Total capitalization (common at $100) | $196,870,000 | |

From this it appears that the total annual *fixed charges* of the reorganized railroad system will be only $1,746,000, and that, after the further deduction from net income of $1,625,000 annually for a discretionary capital fund and $325,000 as a sinking fund for the first mortgage bonds, the net earnings if sufficient thereafter will be applicable to the income mortgage bonds. Thus the total annual charges prior to interest on income mortgage bonds will be $3,696,000; and, if the net earnings are sufficient, the interest on the income mortgage bonds will be $2,363,500, making a total fixed and contingent *debt* in the principal amount of $96,870,000, with total annual charges before dividends in the amount of $6,058,500. If there are additional net earnings a 5% dividend òn the preferred stock would be annually $750,-000, with any surplus of net earnings applicable to dividends on the common stock. Therefore if the annual net earnings exceed $7,000,000 it will be reasonably possible to pay some dividend on the new common stock. As the net earnings applicable to interest charges for 1941 were over $10,000,000, and for 1942 were over $34,000,000, and for 1943 will probably be comparatively large, it is a reasonable expectation that for the next year or two the net earnings of the Railroad will be sufficient to pay some dividend on the common stock, although it is fully realized that how long this prosperity will continue is wholly problematical at the present time.

In the light of all the relevant data the new proposed capitalization would seem to be reasonably conservative, and to this extent in the public interest, although it is fully recognized that the capitalization of the new company is a matter now committed to the exclusive and plenary jurisdiction of the Interstate Commerce Commission under 49 U.S.C.A. § 20a. And therefore whether the reorganization of the Seaboard is to be consummated by equity or bankruptcy procedure, the new capitalization must necessarily first receive the approval of the Interstate Commerce Commission by formal proceedings applicable thereto.

The proposed new capitalization is generally satisfactory to and has been expressly or at least impliedly approved by the representatives of all parties who have intervened in or otherwise participated in the proceedings here in court arising on the exceptions to the master's report, with the exception of one holder of a substantial block of the present stock of the Railway Company who has contended that the present scale of earnings of the Railway Company justifies the beneficial inclusion of stockholders in the reorganization. Full opportunity was offered by the court to this objector to present any additional evidence bearing on the solvency of the Seaboard, but no such new or additional evidence was presented. The temporary large earnings are so clearly due to special wartime causes that they cannot safely be made the basis for the new capitalization. I have therefore concluded that the exceptions to the master's report on this ground must be *overruled*. For similar reasons the objections of certain owners of Adjustment 5% Bonds must also be *overruled*. Likewise exceptions by unsecured creditors are also *overruled*.

## Adjustment Mortgage 5% Bonds of 1949

The special master determined that the holders of this bond issue are not entitled to participate in the plan as the claims thereon had no value. The Fidelity Trust Company of Baltimore is the trustee of this bond issue, under mortgage dated October 1, 1909, which gave a lien immediately *subordinate* to the Refunding Mortgage 4's. The trustee has asserted no claim for the bondholders and has not participated in the proceedings. The original issue of these bonds was in the principal amount of $25,000,000. Only $2,-500,000 are now outstanding in the hands of the public. In 1929 and 1930 the great majority of these bonds were exchanged on a certain diminished basis for Consolidated 6's. Ample opportunity appears to have been given to all bondholders to make this exchange at their option but the present outstanding $2,500,000 thereof failed to do so.

No exceptions to the master's report were filed by any bondholders of this group until after the time allowed therefor by the original order of court setting the case for hearing on October 18, 1943. But during the hearings in court beginning October 25, 1943, Mr. Paul Schmidt, of the law firm of Weinberg & Green of Baltimore, was given leave to file exceptions on behalf of certain bondholders. It appears that a Committee for these bonds at one time during the receivership had been in

existence but had long ceased to function. Opportunity was given to counsel for these exceptants to submit any evidence desired in support of the exceptions, but none was offered. However, a full brief has been submitted and carefully considered by the court. The points therein made, to the effect that these bonds are entitled to participate to some extent in the new capitalization, are (1) the management of the Seaboard Air Line Railway unfairly treated the bondholders by withdrawing the offer for exchange without adequate publicity; (2) in making the financial arrangements and subsequent mergers of the Railroad and new bond issues which gave unfair treatment to the Adjustment 5's, and (3) that the present wartime earnings of the System are sufficient to justify their participation to some extent, the amount of which, however, is not specified. No evidence was submitted in support of these exceptions.

 I cannot find any legal or equitable basis in support of the exceptions. It is not disputed that the bonds have no lien except that wholly subordinate to the Refunding 4's, and it is also clear that the claim on the Refunding 4's is not fully satisfied by the allocation of new securities. As will appear from the annexed tabulation showing the final allocation of new securities, the total claim, principal and interest, of the Refunding 4's amounts to $36,127,360.36. The total par value of all new securities allotted to Refunding 4's is only $18,760,186. While the Consolidated 6% mortgage is subsequent in point of time, and after the further and final consolidation of 1915, it is not shown that the Adjustment 5's have any lien on the property, mostly collateral, securing the 6's. With regard to the contention that the present large System earnings justified some recognition of the Adjustment 5's, it is sufficient to say that there is certainly no evidence before the court from which it can be found that the Adjustment 5's have a legal or equitable claim to any accumulated income as there is not a sufficient amount thereof to satisfy the claim of the Refunding 4's, and indeed no mortgage foreclosure proceeding asking impounding of income has been filed by the trustee for the Adjustment 5's.

### Allocation of New Securities

The much more difficult problem of the reorganization is the allocation of the new securities to holders of secured indebtedness. The total principal and interest of secured claims in the hands of the public adjusted to January 1, 1944, entitled to participate in the new securities amounts to $183,099,252.88 of principal, and $144,780,897.33 of interest or a grand total of principal and interest in the amount of $325,546,816.88. The total new capitalization (taking the 850,000 shares of common stock at par of $100 per share) amounts to $196,870,000. It is obvious that the new capitalization, even if all the new securities are worth their respective pars (taking the common stock at $100 per share), does not greatly exceed 50% of the total secured debt. It is highly improbable that any of the new securities, with the possible exception of the first mortgage bonds, will have a realizable market value of par. The very reasonable estimate is that the new first mortgage bonds will have a market value of a little less than par; the income mortgage bonds 50, the preferred stock 25 or 30, and the common stock about 10 or 15 per share. Of course these are only estimates as it is impossible to predict with even approximate certainty future market conditions. It is, however, entirely clear that (with the exception of a few classes of the secured debt arising from certain well secured underlying liens) the securities afforded by the new capitalization will be insufficient in value to fully satisfy the claims, principal and interest, of the secured creditors. It is inevitable, therefore, that some creditors must suffer capital losses or at least losses of much accumulated interest in the reorganization.

 The master's report shows that he has very fully and carefully classified all the outstanding indebtedness and other claims against the Seaboard Railway Company. Only the secured debt is entitled to beneficial participation in the new securities. The chief problem is how they can be fairly, legally and justly allocated between the several classes of secured creditors. In approaching this major problem the master's report shows that he has fully applied the dominant principles of law of full priority to prior liens, that is to say, a prior lien must be fully and fairly compensated in value in what is received therefor in the new securities, before subordinate liens can participate. However, this principle did not create the real difficulty in the allocation. It consisted rather in the apportionment to be properly made

between holders of first liens by mortgage or otherwise on separate divisions of the whole railway mileage included in the reorganization, involving, as has been noted, (1) wholly owned mileage; (2) leased lines, and (3) independently operated mileage. Much of the difficulty in the allocation consists in determining the fair equitable treatment to be accorded divisions of railroad mileage on which separate classes of secured creditors each have a first lien, especially in those cases where these divisions have had no net earnings but definite deficits in operation and therefore independently considered, have been operated at a loss and not at a profit. While there is little, if any, objection by these respective first lien holders to the new capitalization, practically all of them have objected to what they have considered an insufficient amount of new securities allotted to them respectively. And indeed this is the principal and main difficult problem in the whole of the master's report.

In considering this important feature of the reorganization plan, it is necessary to first clearly understand the principle of allocation adopted by the master. This has been fully explained by him in the text of his report, pp. 227 to 258, and the figures resulting from the principles adopted by him are set out in the numerous tabulations appended to the report. These tabulations are highly complex in detail, and have been made more complicated by the fact that the master first made a *primary* allocation of all the securities when there were outstanding receivers' certificates in a large aggregate amount and when it was proposed that the total issue of first mortgage bonds should be greater than the amount finally recommended of $32,500,000. The retirement of some of the receivers' certificates and the consequent reduction of the first mortgage bonds from $40,000,000 to $32,500,000, and the increase in the income mortgage bonds from $45,000,000 to $52,-500,000, required a *secondary* allocation. The primary allocation of first mortgage bonds is shown in table VIIa, and the final allocation in table VIIb. Similarly the primary and secondary allocations of income mortgage bonds are shown in tables VIIIa and VIIIb and the initial and final allocations of preferred stock in tables IXa and IXb, and of the common stock in tables Xa and Xb. The final result of the primary and secondary allocations of the securities for each of the several classes

of secured creditors is shown in table Ia, sheet 2. While these calculations, as has been said, are complex and at first blush quite confusing, there is no objection on that particular score to the master's report. The figures themselves are not challenged and there is no complaint with respect to the fact that the master, largely for historical reasons, adopted the method of a primary and secondary allocation. What is objected to by many of the separate classes of secured creditors is the principle which the master has applied in both the primary and secondary allocations, as applicable to the several divisions of the Railway System, in determining their quantitative participation in the several classes of the new securities. By reference to tables VII to X, there will be found the amount of first mortgage bonds, income mortgage bonds, and preferred and common stocks, allotted to each of the several railroad divisions. Here it is to be noted that primarily the particular Division is valued (but not at so many dollars) as an entity irrespective of the liens thereon. If the value of the Division is such that the total new securities allotted to it are of greater value than the principal and interest of the first liens thereon, the over-plus is awarded to the holder of the second or subordinate liens in their respective order. And there is no substantial complaint in this case that this full priority of treatment for prior liens has not been fully observed in the master's report. To repeat, the real problem is to fairly determine what should be the proportionate shares of each of the railroad Divisions in the several classes of new securities.

Referring to table Ia, sheet 2, there will be found in the left hand column the designation of particular railroad mortgage divisions by name (or other class of secured debt), and opposite the respective names are shown in column 1 the total principal and interest of claims thereon in the hands of the public, and then in subsequent columns the particular par values of first mortgage bonds, income mortgage bonds, preferred stock and common stocks allotted thereto, with total par value in column 7; and in subsequent columns the allotment is given for each $1,000 par value of indebtedness of the particular bond issue. We need not pause here to presently consider the particular treatment of receivers certificates and indebtedness to the Union Switch & Signal Company and the Pull-

man Standard Car Mfg. Co. (now acquired by the receivers); but for illustration we may take the case of the Carolina Central Railroad Co. 1st Consol. 4's of 1949. These bonds are secured by a first mortgage lien on approximately 273 miles of railroad extending generally from Wilmington, N. C., to Rutherfordton, N. C. Of the ten underlying bond issues, it is one of the best secured with respect to amount of mortgage per mile of railroad and of net earnings. It naturally therefore has received favorable (by other secured creditors considered too favorable) treatment by the master. The principal and interest of this bond issue aggregated as of January 4, 1944, $4,017,620. It received in new first mortgage bonds $1,595,562 and $3,207,438 of income mortgage bonds; $1,064,188 preferred stock and $4,418,340 of common stock, or a total par value of new securities of $10,285,526. But it is to be noted that in making this allocation the master considered that the new securities alone would not be worth par but should be taken at par for the first mortgage bonds, at $50 for the income mortgage bonds, at $25 for the preferred stock and $12.50 for the common stock. On this latter basis the new securities no more than equal the principal and interest of the bond issue. But the total allocation of new securities applicable to the Carolina Central *Division as an entity,* irrespective of the limited number of first mortgage bonds, shows a surplus applicable to this particular Division, with respect to the allocable common stock. By reference to table Xb, column 5, the amount of par value of common stock allocable to the Carolina Central *Division* was $6,032,622, of which amount (see column 6) $1,614,282 has been allotted as a surplus to junior lienors. Table Ia sheet 2 further shows that per $1,000 principal amount of this first mortgage bond issue of the Carolina Central the principal and interest amounted to $1,340, and in the final allocation of new securities each of these bonds received an amount of new securities of a total *par value* of $3,428.51. Similarly table Ia, sheet 2, shows the aggregate of all new securities at par values awarded to the respective classes of secured creditors, both with respect to the whole issue of the particular securities outstanding and also with respect to the amount thereof per $1,000 bond.

As previously noted the most difficult problem in the reorganization plan lies in the relative valuations to be accorded respective railroad divisions. In discussing the same problem in the Milwaukee case, supra, the Supreme Court by Mr. Justice Douglas, 318 U.S. 561, 563, 63 S.Ct. pages 747, 748, said:

"The problem in such a case is not a simple one. The contribution which each division makes to a system is not a mere matter of arithmetical computation. It involves the appraisal of many factors and the exercise of an informed judgment. Furthermore, an attempt to put precise dollar values on separate divisions of one operating unit would be quite illusory. As the Commission recently stated, 'The properties comprise one operating unit; a complete separation of values would necessarily have to be based on extensive assumptions of unprovable validity; and any attempt at such a separation would in the end serve no purpose except to present an apparent certainty in the formulation of the plan which does not exist in fact.' * * * Sec. 77 contains no formula for the making of such an allocation nor for the determination of the earning power of the entire system or parts thereof. The earnings period to be chosen, the methods to be employed in allocating system earnings to the various divisions are matters for the informed judgment of the Commission and the Court. * * * We are not dealing here merely with a first mortgage and a second mortgage on a certain piece of property. For each of the two groups of bondholders has a first lien on a part of the Milwaukee properties. * * * But where, as here, each group of bondholders is contributing to a new system mortgage separate properties from old divisional mortgages, it is necessary to fit each into the hierarchy of the new capital structure in such a way that each will retain in relation to the other the same position it formerly had in respect of assets and of earnings at various levels. If that is done, each has obtained new securities which are the equitable equivalent of its previous rights, and the full priority rule of the Boyd case [Northern Pacific R. Co. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L. Ed. 931], as applied to the rights of creditors inter se, is satisfied. * * * No fixed rule supplies the method of bringing two divisional mortgages into a new capi-

tal structure so that each will retain in relation to the other the same position it formerly had in respect of assets and of earnings at various levels. The question in each case is one for the informed discretion of the Commission and the District Court."

 Earlier in the same opinion, in particular discussion of permissible capitalization of the reorganized company, it was said:

"The basic question in a valuation for reorganization purposes is how much the enterprise in all probability can earn. Earning power was the primary test in former railroad reorganizations under equity receivership proceedings. Temmer v. Denver Tramway Co., 8 Cir., 18 F.2d 226, 229; New York Trust Co. v. Continental & Commercial Bank, 8 Cir., 26 F.2d 872, 874. The reasons why it is the appropriate test are apparent. A basic requirement of any reorganization is the determination of a capitalization which makes it possible not only to respect the priorities of the various classes of claimants but also to give the new company a reasonable prospect for survival. * * * Certainly there is no constitutional reason why earning power may not be utilized as the criterion for determining value for reorganization purposes. And it is our view that Congress when it passed § 77 made earning power the primary criterion. The limited extent to which § 77 sub. e, provides that reproduction cost, original cost, and actual investment may be considered indicates that (apart from doubts concerning constitutional power to disregard them) such other valuations were not deemed relevant under § 77 any more than under § 77B 'except as they may indirectly bear on earning capacity.' * * * Consol. Rock Products Co. v. Dubois, supra, 312 U.S. [510], page 526, 61 S.Ct. [675] page 685, 85 L.Ed. 982. In this case the Commission followed the statute. While it made earning power the primary criterion, it did not disregard the other valuations. It considered them and concluded in substance that they afforded no reasonable basis for believing that the probable earning power of the road was greater than what the Commission had found it to be by the use of other standards."

 So in this case the special master was quite correct, in valuing the several mortgage divisions for their relative participation in the new securities, in giving predominant weight to their respective earning capacities. However, he did not disregard other criteria of value, including cost of reconstruction new less depreciation, and the net value to the Railroad System of the freight contributions made by each of the lines to the System. (Traffic contributed by a separate division has reference to sums earned by the balance of the System on freight business forwarded from or received by each mortgaged or leased line.) He also considered what weight should fairly be given to the so-called "severance studies" with respect to the several Divisions.

### Principles of Allocation of New Securities

In allocating the new securities to the several Divisions the special master proceeded on the following principle. In the primary allocation, the first mortgage bonds, other than those allotted on account of receivers' indebtedness, investment securities, and cash on deposit with the trustees, were allotted on the basis of *segregated earnings* average of the five-year period, 1936 to 1940, with certain adjustments. But the income mortgage bonds, other than those allotted on account of investment securities and the special allotment in a particular case, were allocated *as to one-half thereof* on the basis of *segregated earnings,* and the other half on the basis of the *net value of freight contributions;* with the exception that the $7,500,000 of such income bonds, resulting from the revision of the initially proposed capital structure as above explained, were allocated wholly on the basis of segregated earnings. The preferred and common stocks, other than the allotments thereof on account of investment securities, were allocated *one-third* on the basis of *segregated earnings, one-third* on the basis of the *net contributions to freight traffic,* and *one-third* on the basis of *reconstruction cost new less depreciation.* In the secondary allocation the first mortgage bonds which had been primarily allocated to receivers' certificates and to some small bond issue acquired by the Receivers, were allocated on the basis of *segregated earnings.*

### Method of Determining Segregated Earnings

The proper method of determining these "segregated earnings" of the respective

mortgage Divisions, is factually a very difficult problem and much of the testimony before the master and before the court had relation to this particular problem. Its primary importance in the final results is shown in the figures on table II, annexed to the master's report. In column 1, opposite the designation of the respective divisional mortgages, will be found a figure representing the total average annual gross income (that is, the total railway operating receipts less expenses plus other income, if any) for each of the mortgage Divisions. Other columns indicate adjustments by subtraction or addition made to the respective figures in column 1, and column 10 shows the *adjusted* net earnings of the respective Divisions. (The several adjustments are somewhat complex and detailed, but there has been no particular objection thereto insisted upon.) The total of column 10 represents the total of gross income of all the several Divisions which earned *net* income. But it will also be noted from column 1 that certain of the Divisions, including the Florida West Shore Railway, and Georgia & Alabama Railway, the Southbound Railroad, Naples, Seaboard & Gulf Railway Co., and among the Leased Lines the Seaboard-All Florida Lines, and the Georgia & Alabama Terminal Co., and the Tampa and Gulf Coast Railroad, the Durham & Northern Railway Co., and the Roanoke & Tar River Railroad Co., all had *deficits* instead of net earnings. And even after the adjustment of credits shown on table 2 all of these roads but one still had the net deficits shown in column 9. The aggregate of the deficits in column 9 is $1,231,178. The question as to the proper treatment of these deficits of particular lines will hereafter be further discussed. It is another real difficulty in the whole problem.

To the extent that the new securities are allocated on the basis of segregated earnings, it will be noted that the amount allocated to each Division is represented by the proportion which its net earnings as adjusted and stated in column 10, bears to the aggregate net earnings of all the Divisions *having net earnings,* but *without deducting* from the latter the *deficits* of the Divisions having deficits. It will also be noted from table 2 that the original computation of net earnings of each Division was based on what is referred to as the "Kennedy Segregation Formula". This requires further explanation.

### Formulas for Determining Segregated Earnings

There is no uniformly recognized yardstick for the calculation of the net earnings of separate Divisions of a unified railroad system. The published traffic rates of the Interstate Commerce Commission do not make the segregation and in the case of a wholly solvent railroad there is no need of taking account of such segregated earnings. However, in the problem of reorganization some formula must be devised and applied, with necessary adjustments, by reason of special situations, in the allocation of new securities. Promptly after the initiation of the receivership of the Seaboard, followed by the filing of bills for foreclosure of certain of the mortgages on various segments of the System, the court ordered the Receivers to make segregation of the earnings and pursuant thereto the Receivers prepared a formula called the "General Formula" which undertook to provide the basis for the segregation of the revenues and expenses of various mortgage Divisions and Leased Lines comprising the System; but the court has never yet been asked to approve this or another formula until the present time. Drafts of this "General" formula were submitted from time to time to the organized representatives of security holders, and the results compiled thereunder for each of the years 1931 to 1940 were likewise currently distributed to such representatives. This General formula and its results are shown as exhibits in this case and discussed by the special master on page 215 of his report; and other formulas on succeeding pages. The general principle of the General formula is that freight revenues on traffic local to one line is allocated thereto. Where the freight revenue is applicable to two or more lines, the allocation is made as follows: An allowance of 10% of the total revenue on each shipment is credited to the line originating, terminating or interchanging a shipment, and a mileage pro rata is also allowed the originating, terminating or interchanging line in addition to the 10% allowance. There are also certain other allowances or adjustments made. Passenger revenue or traffic local to one line is allocated thereto, and the passenger revenue applicable to two or more lines is divided between the participating lines on an actual mileage basis. Operating expenses and other income debits and credits are allocated to lines of which or on behalf

of which they were incurred. Sometimes they must be apportioned. With respect to routine expenses, such as crew wages, fuel and other supplies which constitute a large part of such expenses, the rate used is a train mileage pro rata. The formula provides for a rental charge for use of System equipment at the rate of $3\frac{1}{2}\%$ per annum on the average depreciated book value of the equipment as of each year. This rental charge is allocated to the several Divisions. There are some variations in this procedure.

In determining the net earnings the special master adopted in general this formula, but with important modifications made by Mr. Kennedy, testifying as an expert railroad engineer or statistician called as a witness on behalf of the general mortgage bondholders. He undertook to divide the income of the Seaboard System among the various mortgages and leased lines in such a manner as to show the earnings of each as a part of the Seaboard System. Where reports of revenues and expenses between the lines is required, the formula with minor exceptions is claimed to be uniform and in substantial accord with the formula approved by the Interstate Commerce Commission, Finance Docket 10992, N.Y. N.H. & H. Reorganization, 224 I.C.C. 723, 724. The Kennedy modifications of the general formula consist principally in adding "a constructive mileage block" to the actual road-haul mileage on the originating or terminating lines, and dividing the total revenue of each shipment in proportion to the sum of actual plus constructive mileage of each line to the total constructive and actual mileage over which the individual shipment moves. In accordance therewith "the mileage block used in allowing for terminal service was ascertained by finding the system cost of originating and terminating a car of freight or interchanging the same with another road by a method described in the formula". The cost of *interchanging* a car of freight with another road was found equivalent to hauling a car of freight 16 miles. Similarly to each originating and terminating line a constructive block of 58 miles was added to the actual mileage of each shipment hauled.

Under the Kennedy formula revenue for passengers hauled was apportioned on the basis of the actual mileage that each line hauled each passenger. While the master adopted the more significant features of the Kennedy formula, it is to be noted that he departed from it with respect to the treatment of passenger losses which he apportioned to *all* of the lines composing the System in relationship to the gross freight revenue on each line to the total of the System. "In applying this treatment, the net loss from passenger operations of each line divided by System net loss from passenger operations, gave the percentage of the individual line's proportion of total net passenger loss. The revenues from freight operations of each line divided by the System revenues from freight operations gave the line's percentage of the total System revenues from freight operations. In the event this percentage of revenues from freight operations was less than the percentage of net loss of the individual lines from passenger operations, the individual line was given credit for this difference to compensate it for the excess loss it had sustained in passenger operations, and, on the other hand, in the event the percentage of freight revenues was relatively higher, the individual line, by the same method, was charged with the difference in order to make its equitable contribution to the total loss sustained from the passenger operations." See master's report, pp. 242 to 245.

Other formulas for determining segregated earnings were considered by the special master. The representatives of the underlying bonds submitted the so-called Wyer formula proposed by a railroad expert testifying for them. Both Messrs. Kennedy and Wyer also testified in the court hearings. In general the Wyer formula goes into more specific and particular treatment in many respects to determine the net earnings of each of the Divisions. Another formula considered by the special master was the "net ton mile" formula, the theory and practice under which was quite fully explained by Col. Henry W. Anderson of Richmond, Virginia, one of the Receivers in this case, himself a highly experienced railroad reorganization lawyer. As compared with the other formulas it has characteristic simplicity and realism as contrasted with many assumptions in other formulas. As stated by the master, "It is predicated upon the theory that the Railway System is a single integrated unit for rendering the public service required by law and that it

is operated as a unit upon a System basis; that all Mortgage Lines Divisions or Leased Lines are interdependent, and contribute directly or indirectly to the net earnings of the System as a whole, and that each Mortgage Line Division or Leased Line constituting a part of the System is entitled to participate in the net earnings upon the basis of its relative aid or value to the service rendered to the public and for which the System receives payment from the public. The yardstick selected for determining the proper division of revenues and expenses is, in the case of freight revenue, the revenue net ton miles of freight carried, and, in the case of passengers, the revenue passenger miles of passengers carried. The relative value of the Mortgaged Lines Divisions or Leased Lines to the System is found in the number of revenue net ton miles and revenue passenger miles that the special line carries in relation to the other lines of the System, except that equipment rent credits and certain other income are allocated on the basis of ownership or other basis." If this formula were applied it would eliminate the troublesome question of the treatment of *deficits* of certain Division Lines in this case, and would furnish a determination of relative values on the realistic conception of what service each Division actually renders in the System as a whole. It is perhaps regrettable that none of the interested parties in this case advocate, but on the contrary, all oppose the application of the net ton mile formula. The experts in this case (other than Col. Anderson) object to the application of the formula on the grounds principally that it does not take into account the comparatively high operating expenses of particular Divisions owing to grades and other physical conditions, and gives no credit to Lines which it is said or assumed, carry an alleged higher remunerative class of traffic. To the latter objection Col. Anderson points out that all rates for passenger traffic are fixed by the Interstate Commerce Commission and all freight traffic rates are likewise fixed by the Commission. Presumably they are all fixed on a reasonable basis and there is no certain knowledge by any one that there is intrinsically more profit in the carriage of one class of freight than of another. For instance, the freight rate for perishable commodities is much higher than for coal

or pig iron, but the expenses of carriage in refrigeration and other care are also much higher.

The special master obviously had to make a choice of some formula for the calculation of net earnings. His report shows that it was not arbitrarily made but resulted from his best judgment on consideration of all the relevant data. It must be remembered here that there is *no rule of law* which prescribed the criteria for the determination of earnings of separate railroad divisions in one system. The master concluded from the relevant facts that the formula he adopted and applied was the one most equitable and fair in the particular situation. I cannot say that his conclusion in this respect was clearly erroneous despite the fact that, if the matter had been one of original impression with the court, I would have been much disposed to adopt and apply the *net ton mile* formula. However, the circumstances of this particular reorganization seem to render the adoption of this formula impracticable. To adopt it would necessitate a complete revision of the allocation of new securities and the statistical data to be compiled would require a further delay which should be avoided if possible. None of the parties interested in the reorganization, with one possible exception, had advocated it. Nor has it ever heretofore, so far as the court is advised, been actually applied in any of the numerous prior railroad reorganizations either in equity or the more recent ones under section 77. In re Chicago, R. I. & P. Ry. Co., D.C., 50 F. Supp. 835, 862, its applicability was briefly discussed by District Judge Igoe with the following comment: "The court is of opinion that the relative net ton miles of the different mortgage divisions are not an indication of relative values because they take no account of the character of the traffic or of the income derived therefrom."

### The Result of the First Court Hearings

As a result of two weeks' hearings on exceptions to the plan, it appeared that the general attitude of the interested parties was that the plan as a whole was fair and equitable, with the qualification urged by a number of different classes of the secured creditors that they were respectively not given sufficient amounts of the new securities. That is to say, nearly all of them ap-

proved the plan in general for others, but not for themselves in its practical results. The major conflict was between the underlying bonds and the general mortgage bonds. There was also a particular complaint by the representatives of the Division known as the Seaboard Air Line Railway—Atlanta Birmingham 1st 4% bondholders of '33 that the test period of five years (1936 to 1940) adopted by the master was wrong in principle as applied to the Atlanta Birmingham Line, and that the test period for it should have been only the year 1939. The representatives of a minority amount of the Georgia & Alabama Railway 1st Con. 5's of '45 also objected to the allocation to that Division principally on the ground that they were not given any first mortgage bonds or other junior securities allocable on the basis of a proportion of net earnings. This was because for the five-year period the average of the net earnings of that road showed a deficit of $126,078. In only one of these years (1936) did this Division show any net earnings. Counsel for the Tampa Northern (a leased line) bondholders objected to the treatment given that Line by reason of its special situation in that it had on hand in cash and clearly available credits from receivership operations a sum aggregating more than the principal and accumulated interest on the whole outstanding bond issue. A representative of the publicly held preferred stock of the Georgia, Florida & Alabama Division (another leased line) also objected to the plan on the ground that no provision had been made for its preferred stock.

Counsel for the Committee representing the majority of most of the *underlying bonds* objected to the allocation as made by the master's report on several grounds. One was that the master should have adopted the Wyer formula rather than the Kennedy formula; another that the test period for determining earnings should more properly have been the year 1939 alone rather than the five-year period of 1936 to 1940; but the principal objection was in the manner of treatment of deficits of Divisions which did not have average net earnings for the test period. In this respect the contention is that the deficits of the non-profit Divisions should not in effect be pro rated over the other underlying Divisions having net earnings thus diminishing their average net earnings, but such deficits should have been *absorbed* by the net earnings otherwise applicable to the *general mortgage* Divisions. The practical importance of this contention will appear from a study of table II filed with the master's report, to which reference has previously been made. In column 10 there is stated, opposite each Division, the amount of the adjusted net earnings of that Division. The total of the column is $3,237,904. But it will be noted that from this column there has been omitted the deficits incurred attributable to eight of the Divisions which aggregate $1,231,178. In calculating the proportion of the whole net earnings ($2,006,726) for each Division as a basis for the allocation of new securities, the master has *disregarded* these deficits. The mathematical result is that the holders of underlying bonds on Divisions having net earnings receive a *smaller proportion* of the new securities (to the extent the allocation is based on earnings) than they would have received if the deficits of the non-earning Lines had been deducted from the aggregate earnings of the earning Divisions. A simple example will suffice. By reference to table II it is found the adjusted earnings of the Carolina Central Division are about $200,000. The aggregate of all the earnings of the earning Divisions is about $3,000,000. The aggregate deficit of the eight Divisions having deficits is about $1,000,000. If the deficits be disregarded the percentage of net earnings for the Carolina Central is about 7% (of $3,000,000 not of $2,000,000); but if the aggregate deficits are subtracted from the aggregate earnings, the percentage proportion of the Carolina Central Division becomes 10% (of $2,000,000). It must also be remembered that the underlying bondholders are to receive securities in a new *System mortgage* where of course deficits of particular Lines will necessarily be subtracted from earnings of other Lines to determine net earnings available for interest or dividends. Therefore from the standpoint of underlying bondholders, disregarding the deficits of the non-earning Divisions distorts the proportion (of $2,000,000) to which *underlying* bondholders are fairly entitled in the new System securities. And in this respect the principle of allocation adopted by the master would seem to be inequitable to the underlying bondholders having securities in earning

Divisions. The problem is complicated by the fact that about one-half of the total owned mileage of the Seaboard is subject to first liens of the general mortgages or of mortgages not classified as underlying mortgages. This problem with respect to the treatment of the deficits is one of particular difficulty. The method adopted by the master seems to have been approved in a somewhat similar situation in the Rock Island case under section 77 (50 F. Supp. 835, 854); but counsel have stated that the opposite was in fact done in the recent New Haven reorganization although it seems not to have been particularly adjudicated.

At the conclusion of the two weeks' hearing on the exceptions to the master's report it was pointed out by the court that while in view of the whole situation the master's report, considered generally, seemed to be on sound and equitable lines, there were particular features that needed further careful consideration and possible revision. The points specially commented on by the court were as follows: (1) treatment of deficits just referred to; (2) the comparatively large amount of securities allotted to two of the underlying bond divisions, to wit, the Carolina Central and the Florida, Central & Peninsular; (3) special consideration affecting the Tampa Northern and the Atlanta Birmingham, and possibly the Georgia & Alabama Divisions. In order that further consideration should be given to these particular problems the court appointed a Conference Committee of counsel representing the conflicting interests of the underlying and general mortgage bonds, for further study of the problem and to make a report after hearing of certain of the interested and specially objecting parties. The Committee consisted of Messrs. Sunderland, Andrews and France. Pursuant thereto the Conference Committee submitted their report at a further hearing after due notice, which was begun Monday, November 29, 1943.

### Report of the Conference and Compromise Committee

Briefly stated, the report of this Committee proposes the following modifications in the allocation of the new securities: (1) the bondholders of the Tampa Northern Division are to be paid in full, principal and interest; (2) the proportion of the new securities allotted on the basis of earnings is to be changed by pro rating the deficits of the Leased Lines over all the other earning Divisions of the System; but charging to the General Mortgages deficits of mortgage divisions upon which they have a second lien; (3) substantially increasing, largely by block allotments, the securities allotted to the Atlanta, Birmingham and Georgia & Alabama Divisions, and (4) reducing the aggregate amount of par value of securities allocated to the Carolina Central and the Florida Central & Peninsular 1st Cons. 5's, by paying their interest in cash and giving them relatively more of the new senior securities and less of the junior. The Conference Report also proposes further particular treatment of the Georgia, Florida & Alabama Division (a Leased Line) by proposing to acquire the outstanding bonds of that Division by purchase at 75. Some other less important changes in the new securities are proposed particularly regarding the sinking fund for the income mortgage.

An important change made by the Committee Report in the allocation of amounts of the new securities is this. The master apportioned the junior securities to the respective liens on a mortgage division by estimating their market value. Thus income bonds were estimated at 50 and the par value in amount awarded was double the market value; and so the preferred stock was valued at 25, and the common stock at 12½, and the ratio of amounts respectively was one for the first mortgage bonds, two for the incomes, four for the preferred and eight for the common (see master's report p. 253). This caused the excessive amounts of par value of new securities awarded to the Carolina Central and Florida Central & Peninsular. This feature of the master's report seemed wrong in principle to the court, especially as the income bonds represented contingent *obligations at par*. But this has now been corrected by the Committee Report which allocates the new securities on the par basis only, and no mortgage division now receives more than the principal and interest of its whole claim in new securities *at par* (see the annexed table of final allocations).

There should also be mentioned a conflict in interest affecting the Seaboard &

Roanoke Division. This railroad has a preferred stock issue created in 1853 with outstanding 7% preferred stock in the par amount of $244,000. Prior to 1911 this stock was acquired by the then Seaboard Railway and pledged as collateral to the 1st 4% General Mortgage Bonds. In 1911 the Seaboard also acquired all the equity in the Seaboard & Roanoke Railroad subject to the outstanding bond issue and the legal claims, if any, on behalf of the preferred stock. No dividends were declared or paid on this preferred stock to the mortgage trustee for the first general mortgage 4's from 1911 to date. It has been contended by the Maryland Trust Company, successor trustee for the 1st 4's that it is entitled to receive in the allocation of new securities, the equivalent of the principal par value and all accrued but unpaid dividends on the preferred stock to date, as a lien on the Seaboard & Roanoke Division prior to the bonds thereon which were issued subsequently to the issue of the preferred stock. This claim is based on the contention that under the Acts of Virginia and North Carolina affecting the Seaboard & Roanoke the stock became *guaranteed* stock, both as to principal and dividends, having a prior lien to the bonds. The matter was very fully discussed in the master's report, pp. 186 et seq. The conclusion sustained the contention of the Maryland Trust Company, Trustee. However, at the hearings in court on exceptions to the plan further evidence was taken which seemed to have an important bearing on the question involved. As a result the particular issue has been compromised by agreement between the parties and need not be further discussed as the agreed settlement is purely one of particular interest to the parties involved and does not affect the plan otherwise.

At the court hearing on November 29th, the report of the Committee was submitted and the modifications proposed were fully explained and all parties interested were given further hearing thereon. Some additional testimony was also taken particularly with respect to the modifications. The results of the modifications of the plan, with respect to the allocation of new securities, are shown in a tabulation annexed to this opinion. Comparison thereof should be made with sheet 2 of table Ia of the master's report. The net effect of the modifications is to substantially *increase* the amounts of new securities al-located to nearly all Divisions of the Seaboard System, but without changing the amount of the new capitalization in any respect. The reason for this will be presently explained. It is also to be noted that one result of the modifications is that the general mortgage bonds have made a substantial concession to the underlying bonds, due in part to the adjustment with regard to treatment of the deficits.

The increase of securities allocated to most Divisions by the modification, without increase of a new capitalization, is due to the fact that many of the securities previously allocated have now been released and are available for further distribution. In the allocation made by the special master's report a substantial amount of cash ($3,852,480) and a large amount of new first mortgage bonds were allocated to receivers' certificates which were then still outstanding in the amount of $12,841,600 (see sheet 2 of table I-a annexed to the master's report). One result of the court hearings beginning October 25th was an order of court directing the Receivers to now call for redemption and acquire these outstanding receivers' certificates. But it was a condition of the order that their acquisition should be without prejudice to the contentions of the bondholders that they were equitably entitled to have the available cash applied to accumulated interest claims payable out of earnings, and that therefore their claims should be subrogated to the new securities thereby released. Other proposed modifications of the plan above referred to have likewise resulted in releasing some additional securities dealt with in the master's primary and secondary allocations. And the change in the allocation made to the Carolina Central and the Florida Central & Peninsular Divisions also adds to the amount of the securities released from the master's allocation. The modifications proposed by the Conference Report also requires approximately $3,425,829 of cash to be supplied from the receivership assets, in excess of the $15,000,000 which the Receivers heretofore have stated is clearly available at this time for public retirement; but of this additional cash requirement the amount of $2,664,850 required to take care of certain Leased Lines, will not be needed until the consummation of the plan. The Receivers have now stated that this additional cash can now be used if

needed for the important purpose of consummating the reorganization.

One important problem of reorganization relates to the claims of various classes of bondholders to the payment of interest on bonds from cash earnings of the System during receivership. Early in the receivership the general mortgages filed foreclosure proceedings demanding an impounding of interest; but most of the underlying mortgages, by agreement, deferred that action until about three years ago. Related thereto was the question whether the receivers' certificates authorized by the court were to be secured by a lien on the railroads prior to the respective bond issues. The underlying bondholders successfully resisted the imposition of a lien ahead of their bonds; but the general mortgage bonds finally consented to the lien in favor of the receivers' certificates. Some few of these receivers' certificates were issued for imperatively needed cash for the operation of the railroad. They have previously been bought off and furnish no problem. But the majority of the receivers' certificates have been issued to replace maturing equipment trust obligations which, if in default and foreclosed, would have seriously crippled or destroyed the Railroad System in operation. From time to time heretofore some comparatively small amounts of interest have been paid on a few of the well earning underlying bond Divisions; but nothing has been paid for interest on the general mortgages. During the receivership upwards of $50,-000,000 has been spent by the Receivers for imperatively needed repairs or improvements of the railroad properties. Some of these moneys have been expended on Leased Lines. During most of the years of the receivership, and until the last few years, there has been little or no net income available for interest payments; but there have been substantial net earnings from the System in the last three years. In 1939 the amount was $3,965,858; in 1940, $4,761,958; in 1941, $10,664,016; in 1942, $34,566,102 and for 1943 it is *estimated* the amount will be about $28,000,-000. The Receivers now have in cash, and in invested securities readily reducible to cash, about $47,000,000. Of this amount about $13,000,000 is to be presently applied to the acquisition of outstanding receivers certificates. A further sum of indefinite and presently uncertain amount, will be required for the payment of federal taxes and wage claims. There is also an accumulated amount of deferred maintenance which must be satisfied when materials are procurable therefor. The exact amount of cash therefore now available for the payment of accumulated interest is not certain but it is reasonably clear that, except for the reorganization plan, there would be a large sum available for interest payments. Theoretically each of the mortgage Divisions would be entitled to a strict accounting with respect to earnings and available interest payments from the time of their respective impounding of interest by mortgage foreclosure proceedings. But, as pointed out by the master, the very mention of the necessity for such strict accounting with the consequent long delay, would practically make impossible a consummation of the reorganization over a long period in the future. The present favorable earnings of the road, however, make it vitally important that the reorganization should be consummated at the earliest possible time. In view of this highly practical situation, it is obvious, for business reasons, that it is much more in the interests of the bondholders to forget their past claims as to interest and to go ahead with a prompt reorganization which will give them in large part securities having an actual or potential value equivalent to much of the principal and interest of their whole claims, and with a fair present prospect of resumption of interest payments thereon by the reorganized company. The plan of allocation of new securities therefore proceeds on the principle that the claims of all the bondholders for present payment of past interest in whole or in part are waived; and the court understands that there is now no objection to this feature of the plan.

However, on the other hand, the present situation of the receivership with respect to earnings and accumulated cash, presents an aspect of the matter with respect to interest payments, that equitably should have more influence than proposed in the master's report. On page 258 of the report the master contemplated the possible further acquisition by the Receivers of outstanding securities for which provision was made in his plan, thereby releasing further securities for distribution to others. In that event the master proposed that the additional released securities should be allocated in accordance with the principles governing the secondary allocations made by

him which were on the basis of proportion of net earnings. The report of the Conference Committee above referred to makes a modification of this proposed *tertiary* allocation of new securities. With respect to the securities released by the cash provisions made for the acquisition of Tampa Northern and Georgia, Florida & Alabama bonds, after making certain block allotments therefrom (and some further minor adjustments), the balance of new securities so released amounted to $539,980 first mortgage bonds, $450,676 in income mortgage bonds; $105,136 par value preferred stock and $992,203 par value common stock. These additional securities are by the Conference Report distributed to all the mortgage Divisions on the percentages developed by Wyer Ex. No. 3, filed in the court hearing beginning October 25, 1943. This exhibit proceeds on the theory that the bondholders should be compensated for interest payments earned but waived for the past two years. To accurately determine what amounts of interest should so be paid to the respective bondholders would require a strict accounting which would entail long delay in reorganization. As a short cut to an approximate determination, the exhibit assumes that the respective bondholders should be paid interest on a percentage distribution determined by the amounts which they would have received from the new securities allocated to them respectively if interest and dividends thereon (assuming a dividend on the common stock of about $3\frac{1}{2}\%$) had been paid for the two years past. The percentages so obtained are applied in the distribution of the surplus additional securities by distribution thereof to all mortgage divisions.

After very full consideration of the many complex problems involved in the proposed reorganization, the court is of the opinion that the master's plan of reorganization, with the modifications proposed by the Conference Committee, "is fair and equitable, and affords due recognition to the rights of each class of creditors and stockholders, does not discriminate unfairly in favor of any class of creditors or stockholders, and will conform to the laws of the land with respect to participation of various classes of creditors and stockholders" and that except as so modified the master's plan of reorganization should be confirmed.

## Result of Hearing on Modifications of the Plan

The result of this hearing is that the major conflict between the Committee representing the underlying bonds and the general mortgages has been settled by compromise agreement, with the qualifications now to be noted. The prior difference between them consisted principally in the results flowing from the master's disregard of deficits of certain Divisions, and the overplus of par value of securities awarded to the Carolina Central and the Florida, Central & Peninsular Divisions. The modifications adopted obviate the latter objections entirely and also the former except to the extent now to be mentioned. The modified treatment as to the deficits is now agreed to on behalf of all the underlying bonds as far as that point alone is considered. It is also agreed to by counsel for the consolidated 6's which is the largest group of holders of bonds publicly held. The three general mortgages consisting of the First Mortgage 4's, the Refunding Mortgage 4's and the First Consolidated 6's are closely inter-related. Of the First Mortgage 4's, $39,775,000 are outstanding, of which $27,000,000 are pledged as collateral security for the Refunding Mortgage 4's. Of the latter, $85,265,000 are outstanding, of which $65,915,000 have been pledged most of them under the 6% mortgage. Of the latter $86,582,000 are outstanding, of which $22,976,500 are pledged and $61,997,600 held by the public. Of the latter amount about $16,000,000 have been deposited with the Committee for the 6's. There is no present Committee representing the First 4's; but it will have been noted that the majority of them are pledged for the Refunding 4's. There is a Committee represented by counsel for the Refunding 4's and a Committee for the First 6's. Counsel for the Maryland Trust Company the present successor trustee for the 1st 4's, has expressed the view that in the interests of reorganization the trustee as such approves the plan as modified. Counsel for the Committee representing the Refunding 4's has given only tentative and somewhat qualified approval of the modifications. The holders of a comparatively small amount of the 1st 4's acting individually for themselves, have also given personal approval with respect to their own

holdings, but express regret that the modifications of the plan have somewhat decreased the securities which would otherwise have been allocable to the 1st 4's if the plan had not been modified with respect to the treatment of deficits. As previously indicated, the court finds that some modification of the treatment of deficits was required in order to give equitable treatment to the underlying bonds, and considers the modification now agreed upon fair and equitable.

The Atlanta-Birmingham and the Georgia & Alabama are two of the underlying bond divisions. *Some* of the bondholders of each group objected seriously to the master's plan and still object to the plan as modified because they contend they still are not sufficiently generously treated in the allocation of the new securities. The principal amount of the Atlanta-Birmingham 1st 4's is $5,910,000, and of this amount $1,828,000 have been deposited with the Underlying Bondholders Committee. But it is said that a substantial proportion of these have indicated dissatisfaction with the master's plan and possibly still are dissatisfied with the plan as modified. About $1,000,000 of these bonds are held by the Equitable Life Assurance Society of New York, and about another million by other institutions, who have been represented in these proceedings by separate counsel. They, and counsel for the trustee of the bond issue (the Irving Trust Company of New York), also object to the master's plan and the modification thereof. The Georgia & Alabama 1st 5's are outstanding in the principal amount of $6,085,000. About 61% have been deposited with the Underlying Bondholders Committee. Of this amount a small percentage has notified the Committee of their desire to withdraw their bonds from deposit because dissatisfied with their treatment. In addition independent counsel for the holders of a not precisely stated amount but said to be at least several hundred thousand dollars, have vigorously opposed the master's plan and still oppose it with modifications.

### Atlanta-Birmingham Division

█ The objections of some of the Atlanta-Birmingham bondholders have been most ably presented by counsel for the Equitable Life Assurance Society and for the trustee, although the Underlying Bondholders Committee approves the plan as modified for the bonds still properly represented by it. The principal contention of the objecting Atlanta-Birmingham bondholders is that the test period for the determination of its net earnings to the extent that they are used as a basis of allocation of new securities, should be limited to the operating results of the year 1939 alone, and not the average operating results for the five-year period, 1936 to 1940, as found by the master. At the hearing beginning October 25, 1943, the court was tentatively impressed with the view that there were plausible arguments for the selection of the single year 1939 as the test period for determining earnings of all Divisions, and certain considerations then advanced on behalf of the Atlanta-Birmingham Line seemed to make that year particularly more appropriate for it. But further consideration of the whole problem has led to the more mature conclusion on this point that the master's selection of the five-year period is on the whole preferable. Practical considerations reinforce this conclusion. The calculations incident to the allocation of the new securities among the several Divisions to the extent based on earnings are necessarily elaborate, detailed and have required much time and study to prepare. The fundamental change consequent upon selecting the year 1939 alone for the results, would substantially reopen and require revision and further consideration of possibly many special problems and supposed equities likely to be advanced by others of the separate Divisions, with consequent protracted delay in the reorganization. Of course this consideration would not justify rejecting demonstrated equities of the Atlanta-Birmingham or any other Division; but intrinsically considered, there does not seem to be any sufficient justification for other than the uniform treatment of all Divisions with respect to the test period for earnings. I have been convinced on this point by the testimony of Mr. Kennedy given in court, particularly that at the last hearing.

█ The Atlanta-Birmingham 1st mortgage 4% bonds matured May 1, 1933, in the principal amount of $5,910,000. The annual interest charge thereon is $236,400. The total principal and interest as of January 1, 1944 is $10,067,520.30. The Irving

Trust Company of New York is the present trustee for the mortgage. It constitutes a first lien on 200 miles of railroad extending from Howells (Atlanta) Georgia, to Birmingham, Alabama, and Rockmart, Georgia, to Cartersville, Georgia. In the modified allocation of securities this Division receives the following new securities: 1st mortgage bonds $1,839,844; income mortgage bonds, $2,171,218; preferred stock $868,661 and common stock $4,935,076, a total of new securities at par of $9,814,799. The principal and interest of each $1,000 bond as of January 1, 1944, amounts to $1,703.47. Each $1,000 bond thus receives first mortgage bonds $311.31; income mortgage bonds $367.38; preferred stock $146.98 and common stock $835.04 or (at par in new securities) $1,660.71. This does not seem to be unfair treatment for this Division in view of its very unfavorable earnings record in the past.

For the five-year period, 1936 to 1940, its net earnings were

| Year | Amount | |
|---|---|---|
| 1936 | $ 76,608 | |
| 1937 | 20,142 | |
| 1938 | 161,817 | (deficit) |
| 1939 | 196,728 | |
| 1940 | 239,498 | |

or an average earnings for the five-year period of $74,232. It will be noted that for the three-year period, 1936 to 1938, the road had a very substantial net average deficit. It had substantial net earnings in 1939 and 1940. The five-year period gives it the advantage of these two favorable years. The Line points to its very much better earnings in 1939 and 1940 as indicative of changing conditions which have inured to its advantage. The earnings of 1940, however, are clearly attributable to the oncoming war and when we compare the increased earnings of other Divisions for that year, we find that the increases are not peculiar to the Atlanta-Birmingham. For instance, the Carolina Central (a well earning Line) in 1938 had net earnings of only $51,183, increased in 1939 to $111,616 (more than double), and again in 1940 to $230,431 (again more than double). The ratio of increase therefore as between 1939 and 1940 of the Carolina Central was more in proportion for the same years than the Atlanta-Birmingham. Other Divisions also show marked increases in 1940 over 1939. Undoubtedly generally changing economic conditions and particular traffic situations affecting particular divisions have somewhat diversely affected the respective Divisions; but I do not find the evidence as a whole, particularly relating to the Atlanta-Birmingham, sufficient to justify a radically different test period of earnings for it than for the other Divisions, beyond the extent that its somewhat more favorable present traffic conditions have led to the additional block allotment made to it by the Conference Committee Report which was in the amount of first mortgage bonds $280,057; income mortgage bonds $320,392; preferred stock $55,457 and common stock $315,266. The rational basis for this block allotment may be found in the contentions of the Atlanta-Birmingham Line that the Birmingham manufacturing district is furnishing somewhat increased freight traffic, and in possibly the further consideration that an abandonment of some passenger trains recently permitted has somewhat improved its earning situation.

### Georgia-Alabama Division

The Georgia & Alabama Division calls for some further particular comment. The bonds are a first lien on approximately 394 miles of railroad in the States of Georgia and Alabama extending generally westerly from Savannah, Ga., to Montgomery, Ala. An important link of 57 miles in the line extending from Meldrim, near Savannah, westerly to Lyons, Ga., is leased from the Central of Georgia Railway, and the annual charge therefore of about $45,000 must be deducted from the earnings of the road. This last mileage is not included in the mileage previously stated. In 1936 and for some years prior thereto, the earnings of the road were substantial but in 1937 to 1940 inclusive, there were large annual deficits. This pronounced decline in earnings is attributed largely to the lack of freight traffic due to changed conditions in the period served by the line. In 1936 the net earnings were $109,277, but for the succeeding four years there have been large annual deficits each year, the largest being a deficit of $234,272 in 1938, and the smallest being $125,151 deficit in 1940. In the last two years the earnings have substantially increased due to wartime conditions. As the line had no net earnings for the test period they received no allocation of first mortgage bonds in the master's report and the allocations of new securities thereunder made to them

in junior securities were on the basis of their net contributed freight traffic, and reproduction cost less depreciation of the line. The total of their claim including interest to January 1, 1944, was $9,888,125. They received in the master's report no first mortgage bonds but did receive $1,583,644 of income mortgage bonds; $653,199 preferred stock and $3,711,261 of common stock. Per $1,000 bond they received $260.25 in income mortgage bonds; $107.35 in preferred stock and $609.90 in common stock, a total of $977.50 in new securities at par. In view of the better very recent earnings of the road since the test period the Conference Committee Report has given more favorable treatment to this Line and the modified allocation of securities gives the Georgia & Alabama the following: 1st mortgage bonds, $357,408; income mortgage bonds, $1,597,627; preferred stock $656,461 and common stock $3,739,875, a total at par value of $6,351,371. The total claim including interest to January 1, 1944 per $1,000 bond is $1,625, and each $1,000 bond therefore received in the modified allotment of new securities, 1st mortgage bonds $58.74; income mortgage bonds $262.55; preferred stock $107.88 and common stock $614.61, or a total at par of $1,043.78. While this increased allocation to the line is still unsatisfactory to a substantial portion of the bondholders represented at the hearing, the evidence in the case affecting the Line does not justify a larger allowance to it of the limited amount of the new capitalization in fair and equitable treatment of all secured creditors.

 *The Georgia, Florida & Alabama* is a subsidiary of the Seaboard but is also a Leased Line. The Seaboard owns its common stock but its preferred stock issue is publicly held by or represented by Mr. W. H. Simpson, who submitted to the master a plan of reorganization and is here opposing the present plan. The Railroad is in receivership in the United States District Court for the Middle District of Georgia but under orders of the Seaboard Receivership Courts and of the Georgia Court the property has been operated by the Receivers of the Seaboard. The average net earnings of the Line for the five-year period are only $3,623. The Line had deficits in 1937 to 1939 inclusive, and earnings of only $1,606 in 1940. The principal and interest to January 1, 1944 of bonds publicly held aggregated $3,611,565.50. In the master's report (see table Ia, sheet 2) allocations of first mortgage bonds to the amount of $380,384 and other junior securities were allocated to the Division. The total claim for principal and interest of each $1,000 bond was $2,063.75. The total par value of securities allocated per $1,000 was only $1,591.88. As the available proportion of the new capitalization for this Division was not sufficient even at par values to equal the claim, principal and interest, on the bonds, it is obvious that there was no value in the preferred stock. Consequently there is no basis on which it can equitably participate in the reorganization. However, the report of the Conference Committee, as previously stated, proposes to treat the bonds secured by lien on this Division by purchase at 75. It is therefore now unnecessary to further consider the allocation made to this bond issue.

There are numerous other subordinate questions which are fully considered and decided in the master's report. It is not possible in an opinion of any reasonable length to deal with them all. An effort has, however, been made in this opinion to consider and rule on all the exceptions to the master's report which have been pressed at any of the hearings. In consummating the reorganization there will doubtless be a variety of minor details to be considered and acted on by the Reorganization Committee. It is unnecessary to discuss them now. The major questions arising on the exceptions to the master's report were the conflicting contentions between the underlying bonds as represented by the general counsel for the Committee for those bonds and counsel for the general mortgage bonds. The report of the Conference Committee shows that these conflicting contentions have now been harmonized if the plan can now be consummated without substantial modification.

In summary, with respect to the plan as now modified the following observations seem pertinent. First the capitalization of the reorganized company must, of course, be approved by the Interstate Commerce Commission in the public interest. Whether the proposed new capitalization attains the approval is, of course, a matter for the Commission. This court can do no more in that respect than to say that on the information available to it the plan in that respect is approved subject to the action of the Commission. Secondly, the other important feature of the plan is

not primarily a matter of public interest but of private business interests of the secured creditors. Some representatives of each and all classes of secured creditors, who alone are entitled to participate beneficially in the reorganization, have participated in the proceedings before the master or the court or both. Of those who have participated the very great majority have approved the plan as modified.

 In dealing with the whole plan the court has made two assumptions. One, in accordance with rule 53 of the Federal Rules of Civil Procedure, the master's findings should be accepted as correct unless clearly erroneous; but the court has the power to modify them when deemed equitable to do so. The second assumption is that the court is not called upon to critically review every question or detail of the master's report, or each and all of the very numerous exceptions filed to the report, when these exceptions have not been pressed by counsel or parties to the hearings. However, in the consideration of the plan as a whole, it is thought that all material points that have been discussed in court have received attention and the court is not unmindful of the fact that any plan of this kind approved must be fair and equitable for all interests and not discriminatory against any one. It has not been necessary to consider and discuss in detail the allocations of securities made to each one of the numerous separate railroad Divisions and classes of bondholders having liens thereon. The principles which have been applied to all of them, however, have been carefully considered and special consideration has been given to those of particular Lines where the affected bondholders have objected to the plan. The particular case is one of more than usual complexity even in railroad reorganizations. About 2,000 miles of Seaboard Railroad are subject to ten underlying mortgages with three general mortgages subordinate thereto on different mortgage Divisions. The remaining (about 2,000) miles of road owned by the Seaboard are subject to four general mortgages. The separate Divisions subject to the first and second successive liens differ greatly among themselves with respect to geographical location (although, of course, all inter-connecting), classes and volume of traffic handled, net earnings ratio, and amount of bond issue per mile. The System as it now exists represents a historical and piece-meal development over a period of nearly half a century. Many small lines have from time to time been acquired and added to the System generally with underlying mortgages thereon. New lines have been built from time to time and substantial betterments added to others. The whole is now an integrated System of more than 4,000 miles of road owned and operated. The plan of reorganization contemplates a single new System subject to a new consolidated System mortgage with elimination of all prior mortgage liens. The Seaboard has now been in receivership for nearly thirteen years. It is conceded that it has been well managed and operated by the Receivers. The problem that they had of financing and operating the railroad during many of these years has been an extremely difficult one. As an integrated System the result of the operations of the receivership have been very beneficial to the property considered apart from the interests of the bondholders. The present favorable railroad earnings although definitely thought to be but temporary, make the present a golden opportunity for the reorganization of the road with a very conservative capitalization for the future. The problems involved in the plan for allocation of the new securities are intricate in detail. They are, however, to a very large extent problems of business interests rather than controlled by definite rules of law. What will constitute a fair and equitable allocation is necessarily a matter of judgment to be based on careful consideration of all relevant data. It is utterly improbable that any plan could be devised which would give entire satisfaction to all of the numerous and diverse creditors' interests here involved. The dominant rules of law that must be observed in the allocation of the new securities are to be found in recent decisions of the Supreme Court of the United States above referred to. These have been carefully considered and applied as will appear from the master's report. The primary rule is that creditors having claims of prior rank must receive compensation in some way if any portion of their preferred position is surrendered to junior liens. While this is a very difficult problem in many railroad reorganizations, we are not particularly troubled with it here because the present problem, as already noted, is more the fair valuation and equitable treatment of bondholders secured by first liens respectively on different

Divisions of the road. The only real problem with regard to senior and junior liens sharing in the new securities results in the conflict heretofore existing between the underlying bondholders and the general mortgage bonds with respect to the allocation of new securities to the extent that the same are based on earnings. These conflicts have been adjusted by the agreement of the representatives of large portions of the several affected classes. Outside of this heretofore major conflict in the case there remain only as principal objections the dissatisfaction of some of the bondholders of two of the many separate Divisions. Very substantial amounts of bondholders of these same Divisions are satisfied with the modified allocation. It is of the utmost business urgency in the interests of all the bondholders of all classes that the reorganization should be speedily consummated at the present time of favorable earnings.

Recent decisions of the Supreme Court dealing with corporate reorganizations in equity emphasize the importance of action by the court being predicated upon full information as to relevant data as a basis for fair and equitable treatment of all classes of creditors. In conforming to the assumption of rule 53 above referred to that the findings of the master should be accepted unless shown to be clearly erroneous, the court in this case feels that the validity of this assumption is well demonstrated by the very careful and extensively considered report of the special master which speaks for itself in that respect. It represents work over a period of three years with very voluminous evidence on every conceivable aspect of the case and careful consideration by the master of such rules of law as are applicable thereto. But in addition to the evidence before the master the court has heard still further evidence on a few critical points in the report which have been urged upon it by the parties in interest, and the modifications of the master's report now to be made are to some extent the result of this additional evidence and business adjustments fairly arrived at by the major conflicting interests and which, after further consideration, seem fair and equitable to the court.

It is true that the master's report and especially that portion of it which represents the ultimate figures in the allocation of securities shown in the numerous tables appended to the report, seems highly complex and is perhaps clearly understandable only after careful and extended study. This characteristic of the report is not due to any uncertainty or confusion in the application by the master of the principles adopted and applied by him. The complexity results rather from what may be called the historical development of the completed report which was in process before the master for over three years and has necessarily been affected to a considerable extent by the change in the situation resulting from the recent very favorable (if only temporary) largely increased earnings.

## Procedure in Consummating the Reorganization-Equity or Bankruptcy

The report of the special master having been confirmed (with modifications) the highly important question arises as to the procedure to be followed in consummating it. May this be done through equity, or must it be done through the railroad reorganization section (77) of the Bankruptcy Act, 11 U.S.C.A. § 205? This question has also been discussed in the master's report (see pp. 259-271) but without expression of definite opinion by the master who felt that its determination should be deferred for consideration of a Reorganization Committee. At the express invitation of the court, by prior notice to all parties in interest attending the hearings in court, the matter has been discussed by counsel and further considered by the court. It is also to be noted that shortly after the reference of the matter to the special master some delay was afforded by him to the parties to initially consider that question. It appears that the interested parties before the master then wished to continue in equity. With the advantage of hindsight over foresight, it may be thought —that it would have been preferable at that time, if not earlier in the receivership, to have then initiated bankruptcy proceedings for reorganization.

Before the passage of the Act of Congress (in 1933) providing for railroad reorganization as a part of the bankruptcy law (sec. 77) the only juridical mode of railroad reorganization was in equity. Since then it may be thought that equity for such a purpose is outmoded but not outlawed. Since the enactment of section 77

nearly all large railroad reorganizations have been under section 77. Ecker v. Western Pacific Railroad Corp., 318 U.S. 448, 63 S.Ct. 692 (Western Pacific case); Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific R. R. Co., 318 U.S. 523, 533, 63 S.Ct. 727, 735 (the Milwaukee case); In re Chicago & Northwestern Ry. Co., 7 Cir., 126 F.2d 351, certiorari denied, 318 U.S. 793, 63 S.Ct. 987 (the Chicago Northwestern case); In re Missouri Pacific Railroad Co., D.C., 50 F.Supp. 936 (Missouri Pacific case); Chicago Rock Island & Pacific Railroad Co., D.C., 50 F.Supp. 835 (the Rock Island case); In re Denver & R. G. W. R. Co., D.C., 47 F.Supp. 484. A number of additional railroad reorganizations are now still pending before the Interstate Commerce Commission. See Swaine, "A Decade of Railroad Reorganization Under Section 77 of the Federal Bankruptcy Act," Harvard Law Review, June and July 1943. The very recent decisions of the Supreme Court in the Western Pacific and Milwaukee cases above referred to have in many respects clarified the uncertainties as to the permissible scope of activities of the Commission and court respectively, and implicitly, if not expressly, seem to indicate the desirability of the use of section 77 in preference to equity, in order to have the benefit of the informed experience of the Interstate Commerce Commission in the initial formulation and approval of a plan of reorganization. The present posture of the instant case, however, presents a more evenly balanced question for determination as to the desirable procedure in this particular case. That equity is still available is illustrated by the recent reorganizations of the Wabash and the Norfolk-Southern Roads in equity. Congress has recently recognized the continued availability of equity reorganization of railroads in the amendment of the Revenue Acts exempting such reorganization from certain stamp taxes. 26 U.S.C.A. Int.Rev.Code, § 1808 (e) (3). See also 11 U.S.C.A. § 205, sub. p. In the present case and at the present time *all* of the parties in interest before the court very definitely prefer continuation of the equity procedure. A proceeding under section 77 can be initiated only by the voluntary action of the railroad corporation or by a certain percentage of its creditors. No one has yet initiated such a proceeding. Possibly the court could on its own initiative direct the debtor or rep-

resentative creditors to file such a proceeding and probably there would be voluntary compliance with such direction and if not, the court might feel justified in dismissing the whole receivership case.

At present the most obvious single fact is the great importance of speedily accomplishing the reorganization consistent with due regard for equitable and fair treatment of the diverse interests. The principal objection to now proceeding under section 77 is the anticipated further protracted delay that would seem to be probably incident to an entirely new proceeding before the Commission. This would necessarily reopen the whole matter of the proposed plan with the necessity of further public hearings, and it is feared would delay the consummation of any plan to be finally approved for several years. This unfortunately has been the experience of all the cases heretofore pending under section 77. See Swaine, Harvard Law Review, supra. Whether the same result would obtain now, in view of the very substantial agreement as to the plan of reorganization by the major conflicting interests, and the clarification of the whole subject by the recent decisions of the Supreme Court, makes the prediction as to the extent of the delay more uncertain. Of course the proposed new capitalization must now meet the approval of the Commission whether further proceedings be in equity or in bankruptcy, but it is hopefully thought that the conservative features of the new capitalization now agreed upon by all the parties in interest may receive prompt and favorable consideration by the Commission. But, however this may be, it is certain that all the parties represented before the court desire to carry through the reorganization, with respect to the division of the new securities, in equity rather than through bankruptcy. The public interests will be protected by the Commission's action on the proposed new capitalization. The division of the new securities is primarily a matter for the parties themselves. There is some reasonable basis for the hopeful thought of the parties that equity reorganization can be consummated within a comparatively short time. And at least it is the strong desire of the parties that an effort should be made to accomplish this before resorting to bankruptcy. As a matter of personal preference the court would prefer to have the procedure in bankruptcy rather than in

equity, but as the allocation of the new securities is a matter primarily of individual rather than public interest, the court is hesitant to deny to the interested parties a reasonable opportunity to consummate the reorganization, as they think will be possible, much more speedily than they anticipate would be possible through bankruptcy. Whether the equity procedure will prove possible necessarily remains to be seen. It is obvious that there are difficulties in sight, but they are not insuperable, in view of the fact that as a result of modifications of the plan, after hearings on the exceptions to the report, the majority conflicting claims have now been settled. The comparatively minor conflicts still remaining can possibly be subsequently dealt with satisfactorily without undue delay in consummating the general plan.

The most obvious possible difficulty incident to equity procedure is the present uncertainty whether there will remain a sufficient number in amount of dissenting secured creditors who will insist upon payment of their proportionate shares in cash rather than deposit their bonds with Committees authorized to act for them at the several mortgage foreclosures which will be necessary. A large majority of the underlying bonds have heretofore been deposited and the Committee representing them had approved the plan. The trustees of two of the general mortgages also now approve the plan with its modifications. But many of the publicly held bonds under all the mortgages have not yet acted one way or the other with regard to the plan. It is thought, however, that upon the announcement of the approval of the plan by the court with the modifications, a sufficient number of undeposited bonds will hereafter be deposited and the amount of cash necessary to pay non-assenting bondholders will be within reasonable proportions. A period of a few months should be sufficient to test out the question whether sufficient now outstanding bonds will voluntarily participate in the plan. If they do not, the necessary alternative will be bankruptcy procedure. If resort must be had to that, with the result that some substantially different plan is formulated, there is no present certainty that the present large majority approval would be secured for a substituted plan. If not, indefinite further long delay is inevitable. As has been said, the major and dominant consideration seemingly in the interests of all is to promptly consummate the plan while the scale of railroad earnings is so fortunate. The bondholders generally have been without income from their property for thirteen years. The present plan affords a very good prospect for a resumption of income payments at once.

It is true that equity procedure in corporate reorganizations had heretofore in many cases proved unsatisfactory, and this was the primary reason which prompted the enactment of sections 77 and 77B of the Bankruptcy Act, 11 U.S.C.A. §§ 205, 207. See Gerdes, Corporate Reorganizations, Vol. I, §§ 14-20. Both sections, the one for railroads and the other for corporations generally, have many advantages over the equity procedure. That this fact is generally recognized with regard to corporations generally under 77B (now Chap. X, 11 U.S.C.A. § 501 et seq.) of the Bankruptcy Act, is illustrated by the fact that in the Maryland District, while there have been perhaps nearly 100 corporate reorganizations under section 77B, or Chap. X, since the original enactment of section 77B, there has been no corporate equity receivership that the writer of this opinion can recall in recent years. One of the chief difficulties of corporate reorganization in equity is where the property of the corporation lies in different districts, or in the case of railroads, in different circuits, ancillary proceedings are necessary, as in the present case, thus precluding direct unified control, although that condition has happily not heretofore proved a difficulty in this case. It is true, however, that neither this court nor the ancillary Florida court has direct authority or control over all the separate railroad corporations which the plan covers. For instance, the Georgia, Florida & Alabama Road is under the separate jurisdiction of the District Court of Georgia. And the Tampa Northern Railroad is under the direct supervision of a district judge other than Judge Akerman who has been continuing supervision of the ancillary proceedings generally in the Southern District of Florida. Nor has the court direct authority over the Leased Lines which are proposed to be included in the plan of reorganization. However, these difficulties it is thought will be surmounted by the modified plan as previously indicated. See Railroad Leases and Reorganization, 49 Yale Law Journal, 626.

Another important objection that has heretofore sometimes existed in equity corporate reorganizations, is the lack of adequate consideration for non-assenting creditors. In some of the earlier cases the reorganization plan was formulated by the active dominant interests without due regard to the minority dissenting creditors, whose only protection came in the amount of cash allowed them as a result of the "upset price" fixed by the court for the mortgage foreclosure sales. And in practice it is said that in many such cases the upset price was itself the result of a consent order by the courts without adequate consideration of the interests of dissenting creditors. But that real inequity in some of the earlier cases does not apply here, where the upset price to be fixed will properly reflect the fair and equitable features of a plan which has been evolved only after long and careful consideration by the special master and further consideration by the court after extended hearings. And it does not appear that the equity procedure in the present case would be subject to the criticisms illustrated by the case of National Surety Co. v. Coriell, 289 U.S. 426, 53 S.Ct. 678, 77 L.Ed. 1300, 88 A.L.R. 1231, and First National Bank v. Flershem, 290 U.S. 504, 54 S.Ct. 298, 78 L.Ed. 465, 90 A.L.R. 391, where it appears the plan had been approved on inadequate evidence.

The equity procedure is also subject to the criticism that it is cumbersome and may be unnecessarily expensive by reason of the assumed necessity of conducting many mortgage foreclosure sales with fixed upset prices. And there are other reorganization expenses avoided in bankruptcy which must be incurred in equity where a new corporation must be formed and new securities issued subject to substantial incidental expenses, including State stamp taxes.

In such cases as this it may be thought that the formal mortgage foreclosures are an idle and needless formality. They could probably be avoided under section 77. Apart from title questions the chief function of the mortgage foreclosure sale is to determine the cash sum which non-assenting creditors are to receive. Theoretically the dissatisfied bondholders could bid up the sale price; but practically the sale price is determined by the upset price because in the nature of a railroad reorganization, under present federal law, there can effectively be only one purchaser for the property, as authorized by the Interstate Commerce Commission. There are indeed a very few cases in which the futility of such sales has been recognized and dispensed with (Phipps v. Chicago, etc., R. R. Co., 8 Cir., 284 F. 945, 949, 28 A.L.R. 1184, Judge Sanborn; Chicago, R. I. & P. Ry. Co. v. Lincoln Horse & Mule Comm. Co., 8 Cir., 284 F. 955), but this practice has not been generally approved or followed. See Jerome Frank (now Circuit Judge) "Some Realistic Reflections on Some Aspects of Corporate Reorganizations", 19 Va.Law.Rev. 541, 698. But it is felt by the interested parties that these disadvantages of equity procedure are overbalanced in the present case by the prospects of a much earlier consummation through equity than would be possible by separate and entirely new procedure in bankruptcy.

Whether the final procedure is in equity or bankruptcy it will be necessary for the court to appoint a Reorganization Committee to carry it through. The master's report so recommends. And after conferences and suggestions from parties at the last hearing, the court appoints Mr. Otis A. Glazebrook, Jr., of New York, as representative of the general mortgages; Mr. Joseph France of Baltimore, as representative of the majority of the underlying bonds, and Mr. Charles Markell, of Baltimore, a heretofore non-interested party, as this Reorganization Committee. The Committee will also be authorized to select a competent and thoroughly experienced counsel to act for it to take prompt proceedings to carry through the plan in equity if possible. In view of the long pendency of the receivership the court will expect both the Committee and its counsel to act immediately and to report to and confer from time to time with the court on the requisite procedure. If and when it develops that prompt reorganization in equity will not be possible, the court will expect either the debtor or interested creditors to at once thereafter initiate proceedings under section 77. This receivership must now be brought to a close without much further delay.

Counsel will be expected to at once prepare and submit to the court a final order for the confirmation of the master's report with the modifications herein mentioned in accordance with this opinion.

## Allocation of Securities of the New Company as of January 1, 1944

(To be assumed by New Company)

| | Principal Amount (1) | Total Principal and Interest of Claims in Hands of Public Adjusted to January 1, 1944 (2) | Cash (3) | First Mortgage Bonds (4) | Income Mortgage Bonds (5) | Preferred Stock (6) | Common Stock (Taxable at $100 par Share) (7) | Total of Cols. (3) to (7) Incl. (8) | Total Claim Including Interest to 1-1-44 per $1,000 of Principal (9) | Cash (10) | First Mortgage Bonds (11) | Income Mortgage Bonds (12) | Preferred Stock (13) | Common Stock (Taken at $100 per Share) (14) | Total or Claim Cols. (10) to (15) (15) | Initials of Issues (16) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Obligations of Receivers:** | | | | | | | | | | | | | | | | |
| Receivers' Equipment Trust Certificates...... | $ 11,870,000 | $ 11,870,000.00 | | | | | | | | | | | | | | Rec. Eq. Tr. |
| **Seaboard Underlying Divisional Mortgage Bonds:** | | | | | | | | | | | | | | | | |
| Carolina Central RR. Co. 1st Cons. 4's, '49.... | 3,000,000 | $ 4,017,620.00 | $1,017,620 | $ 2,490,000 | $ 510,000 | — | — | $ 4,017,620 | $1,340.00 | $ 340.00 | $ — | $ 170.00 | $ — | $ 830.00 | $1,340.00 | CC |
| Florida Central and Peninsular RR. Co. 1st Cons. 5's, '43. | 4,372,000 | 6,273,820.00 | 1,901,820 | 4,372,000 | — | — | — | 6,273,820 | 1,435.00 | 435.00 | 1,000.00 | — | — | — | 1,435.00 | FC&P 1-C |
| Florida West Shore Ry., 1st 5's, '34. | 785,000 | 1,302,375.00 | 85,405 | 419,405 | $ 284,739 | $ 509,324 | $ 4,017,620 | 1,725.00 | — | — | 117.76 | 555.50 | 377.14 | 1,725.00 | 1,042.78 | FWS |
| Georgia and Alabama Ry., 1st Cons. 5's, '45.... | 5,085,000 | 9,885,956.00 | 35,405 | 1,689,627 | 636,481 | 2,759,875 | 6,273,820 | 1,025.00 | — | 1,025.00 | 282.55 | 107.88 | 674.60 | 1,435.00 | G&A |
| Georgia, Carolina and Northern Ry. Co. 1st 5's, '34. | 5,085,000 | 9,885,956.00 | 1,912,394 | 2,366,515 | 847,285 | 4,813,871 | 8,351,371 | 1,966.10 | — | 1,966.10 | 441.33 | 158.00 | 858.48 | 1,724.00 | GC&N |
| Raleigh and Augusta Air Line Ry. Co. 1st 6's, '31. | 27,000 | 333,480.00 | | | | 4,815,871 | 9,941,165 | 1,240.00 | — | 1,240.00 | | | | 1,243.78 | R&A |
| Raleigh and Gaston RR. Co., 1st 5's, '47. | 61,000 | 76,763.50 | | | | | 1,258.50 | 1,258.50 | — | 1,258.50 | | | | 1,054.69 | R&G |
| Seaboard Air Line Ry. Atlanta-Birmingham, 1st 4's, '33. | 5,910,000 | 10,057,620.30 | 1,833,844 | 2,171,218 | 868,601 | 4,926,076 | 9,814,799 | 1,703.47 | — | — | 267.38 | 146.98 | 835.04 | 1,660.71 | A-B |
| Seaboard and Roanoke RR. Co., 1st 5's, '33. | 2,550,000 | 4,000,402.00 | 727,320 | 1,032,300 | 592,635 | 1,627,085 | 4,000,000 | 1,600.00 | — | — | 290.93 | 237.05 | 651.08 | 1,600.00 | S&R |
| The South Bound RR. Co., 1st (Southern Div.) 5's, '41. | 2,033,000 | 3,805,521.88 | 162,801 | 977,348 | 225,234 | 1,281,920 | 2,647,303 | 1,871.88 | — | — | 480.74 | 110.79 | 630.55 | 1,302.17 | SB |
| Guaranty Trust Co. of N.Y.—Trustee under Lease Agreement Between G&A Ry. & Central of Georgia Ry. Co....... | | | 3,610 | 16,138 | 6,631 | 37,777 | 64,156 | 64,156 | | — | — | — | — | — | — | Guaranty |
| **Total Seaboard Underlying Divisional Mortgage Bonds...** | $ 30,103,000 | $ 49,467,526.68 | $2,919,440 | $11,954,284 | $ 8,109,611 | $ 3,481,746 | $16,947,528 | $ 44,412,609 | | | | | | | | |
| **Seaboard General Mortgage Bonds:** | | | | | | | | | | | | | | | | |
| Seaboard Air Line Ry., 1st 4's, '50. | 12,768,000 | 21,261,273.00 | | $ 1,746,776 | $ 5,877,560 | $ 4,705,423 | $ 4,931,274 | $ 1,665.20 | $ 136.81 | $ 690.53 | $ 268.53 | | $1,665.20 | | 1st 4's | |
| Seaboard Air Line Ry. Refunding 4's, '59. | 19,350,000 | 36,127,360.36 | | 2,091,250 | 653,730 | 10,936,603 | 18,760,186 | 1,867.05 | 108.07 | 261.32 | 33.78 | 566.34 | 989.51 | Ref. | |
| Seaboard Air Line Ry. 1st & Cons. 6's, '45.... | 61,997,500 | 130,696,345.65 | | 12,056,723 | 20,975,169 | 37,110,092 | 73,595,732 | 2,108.09 | 194.47 | 338.32 | 55.95 | 598.72 | 1,187.07 | I&C 6's | |
| **Total Seaboard General Mortgage Bonds...** | $ 94,115,500 | $188,084,979.01 | | $15,894,749 | $34,963,287 | $52,783,118 | $113,617,102 | | | | | | | | | |
| **Seaboard Collateral Trust Obligations:** | | | | | | | | | | | | | | | | |
| Seaboard Air Line Ry. Co. 3-Yr. 5% Secured Notes, '31. | 6,877,575 | 13,487,830.03 | | $ 1,106,673 | $ 2,029,670 | $ 333,332 | $ 3,591,842 | $ 7,121,517 | $1,961.13 | $ 165.58 | $ 270.62 | $ 44.44 | $ 478.91 | $ 949.53 | 3-Yr. Notes | |
| Seaboard Air Line Ry. Co. Sec. 210 6% Loan Notes to U. S. Gov't.... | 14,440,578 | 23,707,112.22 | | 3,301,718 | 5,744,022 | 943,340 | 10,165,015 | 20,154,095 | 1,641.70 | | | | | | 210 Loans | |
| **Total Collateral Trust Obligations...** | $ 21,318,153 | $ 37,194,943.18 | | $ 4,408,391 | $ 7,773,692 | $ 1,276,672 | $13,756,857 | $ 27,275,612 | | | | | | | | |
| **Total Seaboard Gen'l Mtgs., Incl. Collateral Trust Obligations...** | $115,433,653 | $225,279,922.79 | | $20,363,140 | $42,736,979 | $11,252,710 | $66,539,975 | $140,892,804 | | | | | | | | |
| **Debt of Subsidiary Railroad and Terminal Companies, the properties of which are operated by Seaboard Receivers as part of the System:** | | | | | | | | | | | | | | | | |
| Seaboard-All Florida Lines, 1st 6's, Ser. A and B, '35. | 7,650,000 | 10,214,103.00 | $1,312,500 | 50,084 | 198,762 | 99,482 | 566,317 | 914,645 | $2,117.00 | $ 750.00 | $ 50.08 | $ 108.76 | $ 99.48 | $ 566.32 | $ 914.64 | S-A F | |
| Seaboard-All Florida Lines, 1st 6's, Ser. A and B, '35. | 1,000,000 | 1,819,270.83 | | | | | | 1,819.27 | | | | | | | | S&A T | |
| Georgia and Alabama Terminal Co., 1st 5's, '48. | 1,750,000 | 3,611,502.50 | 87,763 | 412,788 | 155,086 | 883,887 | 2,063,775 | 2,063.75 | | | | | | | GF&A | |
| Tampa & Gulf Coast RR. Co. 1st & Ref. 6's, '62. | 1,184,000 | 2,218,520.00 | | | | | | 1,873.75 | | | | | | | T&GC | |
| Tampa Northern RR. Co., 1st 5's, '38....... | 1,258,000 | 1,352,350.00 | 1,352,350 | | | | 1,352,350 | 1,352.350 | 1,075.00 | 1,075.00 | | | | | | TN | |
| **Total Debt of Subsidiary Railroad and Terminal Cos., etc...** | $ 12,851,000 | $ 25,215,806.33 | $2,664,850 | $ 137,847 | $ 611,500 | $ 254,508 | $ 1,450,204 | $ 5,110,029 | | | | | | | | |
| The Seaboard-Bay Line Co., Sec. 210 Loan-Deficiency Claim...... | | 349,683.33 | 44,729 | 41,350 | 10,976 | 62,293 | 159,848 | | | | | | | | | Def. Claim |
| Unpaid Interest not included above.... | | 522,887.75 | | | | | | | | | | | | | | Unpaid Int |
| **Total....** | $170,257,663 | $312,705,216.68 | $5,584,290 | $32,500,000 | $35,000,000 | $15,000,000 | $85,000,000 | $190,584,290 | | | | | | | | Total |

(Properties subject to these mortgages to be acquired by Reorganization Committee through foreclosure or otherwise)

(Properties subject to this mortgage to be acquired by Reorganization Committee through foreclosure or otherwise)

(To be paid when due or when conditions of payment are complied with)